IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| VTX COMMUNICATIONS, LLC, and VTX INVESTMENTS, LLC, individually and derivatively on behalf of McAllen-Edinburg-Mission SMSA Limited Partnership<br>*and*<br>VTX COMMUNICATIONS, LLC, and VTX INVESTMENTS, LLC and SWT UNREGULATED PROPERTIES, INC., individually and derivatively on behalf of Texas RSA 18 Limited Partnership<br>*and*<br>VTX COMMUNICATIONS, LLC, and VTX INVESTMENTS, LLC and RIVIERA CELLULAR & TELECOMMUNICATIONS, INC., individually and derivatively on behalf of Texas RSA 19 Limited Partnership,<br>Plaintiffs | § § § § § § § § § § § § § § § § § § § § | |
| VS. | § § | CIVIL ACTION NO. 7:19-CV-00269 |
| AT&T INC.<br>*and*<br>MCALLEN-EDINBURG-MISSION SMSA LIMITED PARTNERSHIP, TEXAS RSA 18 LIMITED PARTNERSHIP, and TEXAS RSA 19 LIMITED PARTNERSHIP<br>*and*<br>NEW CINGULAR WIRELESS PCS, LLC d/b/a AT&T Mobility, individually and in its capacity as General Partner of McAllen-Edinburg-Mission SMSA Limited Partnership, Texas RSA 18 Limited Partnership, and Texas RSA 19 Limited Partnership and AT&T MOBILITY CORPORATION<br>*and*<br>CRICKET COMMUNICATIONS, LLC and CRICKET WIRELESS, LLC,<br>Defendants | § § § § § § § § § § § § § § § § § § § § § § | |

6GM4899.DOCX

**PLAINTIFFS' SECOND AMENDED PETITION**
**CONFORMED TO FEDERAL RULE OF CIVIL PROCEDURE 23.1**

NOW COME VTX Communications, LLC and VTX Investments, LLC (collectively, "VTX"), individually and derivatively on behalf of McAllen-Edinburg-Mission SMSA Limited Partnership (the "McAllen Partnership" or "McAllen"), VTX and SWT Unregulated Properties, Inc. ("SWT"), individually and on behalf of Texas RSA 18 Limited Partnership (the "RSA 18 Partnership" or "RSA 18"), and VTX and Riviera Cellular & Telecommunications, Inc. ("Riviera") individually and on behalf of Texas RSA 19 Limited Partnership (the "RSA 19 Partnership" or "RSA 19" and together with McAllen Partnership and RSA 18 Partnership the "Partnerships," and each a "Partnership"), Plaintiffs in the above-styled and numbered cause (the "Plaintiffs" or the "Limited Partners"), complaining of the following Defendants: the Partnerships; New Cingular Wireless PCS, LLC d/b/a AT&T Mobility ("AT&T Mobility"), individually and in its capacity as General Partner of the Partnerships, and AT&T Mobility's manager, AT&T Mobility Corporation; Cricket Communications, LLC and Cricket Wireless, LLC along with any other AT&T entities controlling Cricket Communications, LLC and Cricket Wireless, LLC (the "Cricket Defendants"); and AT&T Inc., the ultimate controlling parent of the AT&T Defendants and the Cricket Defendants ("AT&T Parent") (collectively AT&T Parent along with AT&T Mobility, AT&T Mobility Corporation and the Cricket Defendants, as applicable, referred to as "AT&T" or the "AT&T Defendants"), and for cause of action would respectively show this Court the following:

## I. SUMMARY OF THIS CASE

1.     AT&T Mobility is the general partner of each Partnership. The Plaintiffs are affiliates of rural South Texas telephone companies and are limited partners in the Partnerships. The Partnerships are responsible for providing, and as between the Parties have the sole right and

authority to provide, all wireless service in their Partnerships' respective service areas, which collectively include most of South Texas. However, in derogation of its multiple duties to the Limited Partners, AT&T uses each Partnership's network to operate "Cricket" as a separate wireless provider wholly-owned by AT&T Parent in direct competition with the Partnerships in the Partnerships' respective service areas. Additionally, AT&T is withholding ownership of Partnership spectrum, which is valuable Partnership property, from the Partnerships so as to purportedly (at best) license that spectrum to the Partnerships at excessive rates on unreasonable, unilateral terms that provide impermissible profits to AT&T. Additionally, AT&T has developed multiple revenue streams using Partnership assets and opportunities without disclosing, allowing participation in, or properly sharing with the Partnerships the revenues attributable to the Partnerships, while improperly allocating costs and expenses to the Partnerships. In essence, AT&T has illicitly used Partnership networks and assets without proper compensation or at no compensation to the Partnerships. This has resulted in impermissible profits to AT&T and/or other harm to the Partnerships and their business. At the same time, AT&T has provided and continues to provide opaque, misleading and confusing financial information and financial statements to the Limited Partners using multiple books of account, and obscuring the consequences of AT&T's conduct. AT&T also has failed to properly disclose to the Limited Partners and properly document transactions between AT&T entities and the Partnerships. AT&T has essentially ignored and continues to ignore the Limited Partners' requests for information and demands that AT&T cease its wrongful activity. Accordingly, the Limited Partners have been forced to file this Petition and pursue these actions for relief.

## II. <u>FACTUAL BACKGROUND</u>

2.      In the mid- to late- 1980s, each Limited Partner or their respective predecessor entity joined in their respective Partnerships with AT&T Mobility's corporate predecessor to provide wireless service throughout much of South Texas. At the outset, the Limited Partners took considerable risk in participating in the Partnerships because the market for wireless service was uncertain and the possibility of substantial Partnership capital calls (for facilities deployment, equipment purchases, etc.) was high. Over the years, the Partnerships have been successful.

3.      In 2004, AT&T, then operating its mobile wireless business under the "Cingular" brand, acquired a direct competitor of the Partnerships then operating under the name of "AT&T Wireless." Over the next months, AT&T and the Limited Partners of the affected Partnerships, RSA 18 and RSA 19, worked through the appropriate valuation of the AT&T Wireless assets in the Partnership service areas. In 2005, those issues were finally resolved and AT&T contributed the AT&T Wireless assets to the Partnerships consisting of (1) customers, (2) spectrum and (3) tower sites. AT&T also reimbursed the Partnerships for the "economic benefits" of the AT&T Wireless operations prior to contribution of the three categories of assets to the Partnerships.

4.      At some point following the AT&T Wireless transaction, AT&T's attitude toward its cellular system partners around the country appeared to change. By 2009, AT&T initiated business plans[1] to eliminate a number of its cellular partnerships. The Partnerships in this lawsuit were secretly considered by AT&T for elimination. Upon information and belief, AT&T still desires to eliminate the partnerships or at the very least suppress the partnerships' values and profitability. Consequently, Plaintiffs assert the claims brought against AT&T in this lawsuit are predicated by AT&T's desire to obtain for itself the benefits of the Partnership assets, business

---

[1] Plaintiffs are aware of "Project Smoothie" and "Project Smoothie II" although such business plans may have been labeled under different names.

opportunities, and profits to the detriment of the Limited Partners and the Partnerships consistent with AT&T's long term goal of eliminating such partnerships.

5.      In 2010, as data services and revenues began to become an important part of the cellular business, AT&T adopted a "data cost sharing process" affecting all of its partnerships. Under this process, AT&T implemented a method by which it would only pay a cost-based rate to pass AT&T affiliate data traffic on its partnerships' networks. Partnerships would still be paid a purported "arms'-length rate" (i.e. a rate based on AT&T's third-party roaming arrangements) to pass an AT&T affiliate's voice traffic, but would inexplicably only receive cost reimbursement to pass an AT&T affiliate's data traffic. AT&T never sought or obtained the Limited Partners' consent to this process, nor did AT&T ever discuss or explain this process to the Limited Partners. In fact, the Limited Partners would only come to understand the nature and impact of this process years later through discovery in this lawsuit.

6.      In March, 2014, AT&T Parent purchased another mobile wireless business competitive with the Partnerships, "Cricket Wireless." AT&T Parent represented to the FCC and publicly announced that Cricket would be integrated with AT&T's existing operations to create the "new Cricket." However, instead of contributing the relevant Cricket assets to the Partnerships as AT&T had done with AT&T Wireless, the Limited Partners eventually realized that AT&T intended to operate the Cricket assets in the Partnership service areas as a separate business in competition with the Partnerships using the Partnership's network to serve that business. Moreover, the Cricket business would and does operate in direct competition with the Partnerships' own prepaid market product formerly referred to as GoPhone and now referred to as AT&T Prepaid.

7.      Coincident with AT&T's acquisition of Cricket, AT&T Mobility began to orally advise

the Limited Partners in Partnership meetings that AT&T would begin to seek compensation for the additional spectrum acquired and used for the benefit of the Partnerships.

8.      In a letter dated October 28, 2014, AT&T Mobility declared a capital call for the McAllen Partnership. AT&T announced to VTX as the sole Limited Partner of the McAllen Partnership that AT&T had negotiated spectrum agreements with itself at massive monthly cost to the McAllen Partnership. AT&T backdated the agreements and monthly spectrum charges to as early as January, 2014, creating an artificial financial crisis and substantial losses in the McAllen Partnership operations. AT&T Mobility declared the capital call, due within less than 60 days, to offset the losses it created by the self-interested and back-charged spectrum payments. VTX's share of this capital call was over $2,000,000. If the capital call was to remain in place, VTX, a rural South Texas telecommunications provider, would have been forced to either come up with the millions demanded by AT&T or else suffer dilution of its partnership interest in the McAllen Partnership.

9.      VTX responded to the contrived financial crisis created by AT&T in the McAllen Partnership by advising AT&T that VTX would fund its share of the capital call. VTX also notified AT&T Mobility's President and other AT&T personnel through a series of letters (later joined as to RSA 18 by a separate letter from SWT) objecting to AT&T's conduct with the spectrum, demanding information as to Cricket, reminding AT&T Mobility and its personnel of AT&T Mobility's duties of loyalty and care (including the duties of good faith, fair dealing, and candor), and AT&T Mobility's express obligations in the Partnership Agreement not to compete with the Partnership or profit from services to the Partnership, to recognize the Partnership's ownership of spectrum whether or not owned nominally in AT&T's name, to act at all times in the best interests of the Partnership, to obtain and disclose to the Limited Partners written

documentation of all affiliate arrangements between AT&T (or any AT&T entities) and the Partnerships, to seek the most profitable Partnership services, and to not, directly or through its affiliates do anything inconsistent with the Partnership Agreement or contrary to the best interests of the Partnership.

10.     Almost immediately after VTX's first letter advising that VTX would meet the capital call, AT&T Mobility rescinded the capital call for the McAllen Partnership. Thereafter, VTX and the other Limited Partners also began to see revenues in Partnership financials from Cricket customer usage of the Partnership networks obliquely included with other third-party revenues under the category of "outcollect revenues."

11.     In response to the letters, AT&T Mobility personnel met with VTX personnel in April 2015 as to the McAllen Partnership and in July, 2015 with all of the Limited Partners as to the McAllen Partnership, RSA 18 and RSA 19. At the meetings, Eric Wages for AT&T Mobility and presumably other AT&T Defendants disclosed that he and his group "could not stop the train" of AT&T purchasing and operating Cricket separate from the Partnerships. He went on to present spreadsheets purportedly representing that the Partnerships were better off not owning the Cricket customers, but instead would purportedly be better off accepting revenue in amounts unilaterally determined by AT&T for Cricket customers' usage of the Partnership networks. As support for the proposition, Eric Wages represented that the Cricket customers had extremely high turnover or "churn" resulting in an expected customer life of less than two to three years, depending upon the Partnership. He represented that the average revenue per user, or "ARPU," per Cricket customer was approximately $32.00. He represented that if AT&T contributed the Cricket customers to the Partnerships, the high acquisition costs that would be allocated to the Partnerships by AT&T assured that the Partnerships could not profit by directly owning the

Cricket customers, but that the Partnerships could profit if AT&T (through the Cricket Defendants or otherwise within AT&T), owned those customers and paid for Partnership network usage. Mr. Wages explained that AT&T did not have any written agreements with the Partnerships as to AT&T's use of the Partnership networks for AT&T's Cricket business, but would compensate the Partnerships for Cricket usage at rates completely within the sole control of AT&T and subject to change in January and July of each year, with at least some of those rates being substantially less for Cricket customers "homed" to the Partnership service areas than the rates charged "non-homed" Cricket customers roaming in the Partnership service areas or other third parties using the Partnership networks. Mr. Wages and the other AT&T Mobility representatives present at the meetings also assured the Limited Partners that Cricket customers and the marketing to those customers was different from Partnership customers such that there was not substantial risk of cannibalization of the Partnership customers by AT&T's Cricket marketing and operations in the Partnership service areas.

12.     Within a few months after the meetings, the Limited Partners became aware through public pronouncements of senior AT&T executives that the representations made to the Limited Partners were either untrue in material respects when made or were at least materially misleading when made.

13.     AT&T has made no effort to correct the misrepresentations made to the Limited Partners at the meetings. Further, AT&T has withheld information as to Cricket customers, operations and profitability, notwithstanding repeated requests by the Limited Partners for candor and disclosure as to AT&T's improper competitive operations through Cricket in the Partnership service areas. As of the filing of Plaintiffs' Original Petition, though, AT&T Mobility began admitting in its quarterly reports of operations to the Limited Partners that AT&T's improper competitive

operations through Cricket were causing deactivations of Partnership customers that move to Cricket from the Partnerships. For the first time in the history of the Partnerships, each Partnership began to see steady quarterly declines in customers as Cricket customers in the Partnership service areas have increased.

14.     At the meetings in April and July, 2015, Eric Wages and the other AT&T Mobility representatives asserted that AT&T would not transfer spectrum to the Partnerships, even though such transfer is required by the respective Partnership Agreements. They also stated AT&T would commence spectrum charges to RSA 18 and RSA 19 as of July, 2015, this time without backdating and back-charging the Partnerships. As explained by Mr. Wages, the Partnerships would pay these spectrum charges perpetually as to spectrum used by the Partnerships. That would result in AT&T receiving a perpetual stream of revenues from the Partnerships without further expense to AT&T (other than taxes on its revenues from the Partnerships). Mr. Wages provided spreadsheets of AT&T's purported "book value" and purported "fair value" of each spectrum FCC license and the rates AT&T would charge for the spectrum usage based on AT&T's calculation of "fair value" of the spectrum. The spreadsheets revealed that, as to much of the spectrum, AT&T would recover its costs of the spectrum well before the end of the Partnerships' initial twenty-year payment term (in at least one case within three years). Additionally, Mr. Wages provided at the meeting a copy of the form of services agreement he said was used to implement AT&T's scheme. The services agreement terms are not fair to the Partnerships. Among other unfair terms, the services agreements have twenty-year terms, are renewable for another twenty years with recalculated spectrum charges that could increase, and do not have any renewal option at the end of the renewal term. If not renewed, AT&T would own the spectrum outright without any obligation under the services agreements to convey, lease

or license it to the Partnerships. That would deprive the Partnerships of a significant, critical asset even though they would have paid AT&T in the first twenty-year term more than its cost to buy the spectrum. By withholding Partnership spectrum, overcharging for it use, and implementing services agreements that are unfair to the Partnerships and Limited Partners, AT&T is wrongfully (for its own unilateral benefit) depressing the value of the Partnerships and profiting to the detriment of the Partnerships and Limited Partners.

15.     While AT&T's retention of spectrum in the Partnership service areas and its retention of the Cricket business (with more than coincident timing) each willfully and blatantly disregard AT&T's duties to the Partnerships, AT&T's approach to these situations is markedly different. Where, in the case of spectrum, AT&T is receiving payments from the Partnerships, AT&T imposes on the Partnerships excessive fixed monthly obligations for at least twenty years, renewable (at potentially higher rates) for another twenty years, and then renewed (if at all, presumably at even higher rates) at AT&T's option into perpetuity under one-sided written agreements that guarantee a long-term revenue stream and profit to AT&T regardless of the circumstances to the Partnerships. Where, in the case of Cricket, AT&T is paying money to the Partnerships, AT&T's approach is structured without any written contractual arrangements and without any ability to hold AT&T accountable to any rates and terms that might be evaluated as fair to the Partnerships and measurable against comparable third party arrangements, and AT&T frequently adjusts the rates it pays for Cricket usage, generally lowering those rates. For example, around the time Plaintiffs' Original Petition was first filed, AT&T unilaterally lowered the amount it pays for data usage of the Cricket customers by 20% thereby reducing Partnership revenues paid for data usage by Cricket users for the sole and exclusive benefit of AT&T.

16.     AT&T's conduct as to the spectrum arrangements and Cricket are not the only areas

where the Limited Partners believe AT&T Mobility's willful and grossly negligent mismanagement of the Partnerships and AT&T's interference with the operations and business opportunities of the Partnerships have damaged the Partnerships and the Limited Partners. There is much the Limited Partners did not know at the time of the filing of this lawsuit and much the Limited Partners still do not know, notwithstanding fervent efforts to obtain information from AT&T. This lack of knowledge is a direct result of AT&T's willful obfuscation and manipulation of its business operations and practices through a complex morass of financial and operational reporting and conscious indifference to AT&T's well settled duties of complete candor to the Limited Partners and in contravention of the Partnership Agreements which mandate that the Limited Partners must "[h]ave on demand true and full information of all things affecting the Partnership, and a formal account of Partnership affairs whenever circumstances render it just and reasonable." Moreover, AT&T has repeatedly failed and refused to adequately respond to the Limited Partners' requests for information regarding these issues.

17.     These failures of disclosure by AT&T to its Limited Partners are more than errors of omission, but are part of a pattern and practice of AT&T to deliberately fail to disclose material facts as to the operations of the Partnerships, business opportunities available to and/or diverted from the Partnerships, AT&T's self-dealing arrangements using Partnership assets and opportunities, as well as the other "things affecting the Partnerships." The General Partner of the Partnerships and its affiliates participating in the self-dealing arrangements have a duty to disclose to the Limited Partners all material facts and information applicable to those activities and opportunities. Absent full and truthful disclosure, the Limited Partners have had no opportunity to discover those facts. Without full information from AT&T, the Limited Partners have relied on AT&T to be acting in good faith and in the best interests of the Partnerships

consistent with their legal duties to do so. It was only in the lead up to, and subsequent to the filing of, this lawsuit that the Limited Partners have begun discovering and continue to discover the extent of ongoing and continuing acts of gross negligence, willful misconduct, self-dealing and interference by AT&T causing damage to the Partnerships and Limited Partners. The scope of those activities is insulated by AT&T's continuing fraudulent conduct and fraudulent nondisclosure. Notwithstanding that, the Limited Partners have become aware of at least the following additional matters:

     a.     AT&T has an ongoing plan and project to remove the Limited Partners and take the Partnership business for itself;

     b.     AT&T keeps multiple sets of books applicable to the cellular business;

     c.     Rates paid by Cricket customers for use of the Partnership networks have been kept secret from the Limited Partners since the filing of the lawsuit;

     d.     Roaming data traffic from Cricket and AT&T Mobility customers is only reimbursed to the Partnerships at cost, if at all;

     e.     AT&T disregards the Partnership prepaid wireless products, while considering Cricket its flagship prepaid business;

     f.     AT&T collects and maintains data from customer usage of the Partnership networks in a "Data Lake" for AT&T's use in advertising and other revenue opportunities for AT&T's benefit;

     g.     AT&T has sold data information and/or access to the Partnership networks and usage thereon to agencies of the United States Government, possibly the NSA, without accounting to the Partnerships for those revenues;

     h.     AT&T has sold cellular numbers and cell phone location information to third

parties without accounting to the Partnerships for those revenues;

i.      AT&T sells various media content products that are highly dependent on the Partnership networks but retains the resulting profits for itself while in some cases only reimbursing the Partnerships their cost to carry the associated traffic; and

j.      AT&T receives revenues for connected devices and other products dependent on the Partnership networks without properly accounting to the Partnerships and appropriately contributing for those revenue opportunities and revenue streams.

There are likely other areas of misconduct by AT&T of which the Limited Partners are not aware at this time due to the intentional obfuscation and refusals to disclose the true and accurate nature of the activities and things affecting the Partnerships' businesses.

18.     Today, AT&T continues to make the Partnership networks available to its affiliates for data roaming at cost for its own profit. It continues to operate Cricket in competition with the Partnerships for AT&T's exclusive profit. It continues to systematically lower the rates paid to the Partnership for Cricket's network usage while extracting a steady revenue stream from the Partnerships in the form of excessive spectrum charges. All the while, AT&T continues to develop new business opportunities and revenue streams powered by the Partnership networks without appropriately sharing those revenue streams with the Partnerships. These activities are wrapped up in a system of complicated and confusing cost allocations that appear to overcharge the Partnerships, resulting in even more profit to AT&T to the detriment of the Partnerships and Limited Partners. AT&T has willfully obscured its failure to share these revenue streams and its complicated and confusing cost allocations through failures to disclose information or through incomplete or misleading disclosures.

19.     As a result of these and other issues related to AT&T's operation and treatment of the

Partnerships, the Limited Partners initiated and must pursue this lawsuit.

## III. FEDERAL RULE OF CIVIL PROCEDURE 23.1

20.　　The Limited Partner Plaintiffs were, at the time of the transactions complained of, and remain to this day limited partners in the respective Partnerships, specifically:

     a.　VTX Communications, LLC or its wholly-owned subsidiary VTX Investments, LLC was and remains a limited partner in McAllen, RSA-18, and RSA-19;

     b.　SWT was and remains a limited partner in RSA-18; and

     c.　Riviera was and remains a limited partner in RSA-19.

21.　　The actions alleged in this Complaint are not collusive ones to confer jurisdiction that the Court would otherwise lack.

22.　　The facts pleaded by Plaintiffs herein demonstrate that AT&T Mobility is not a disinterested or independent General Partner with regard to the alleged transactions, and therefore pre-suit demand would be futile, and that to the extent, if any, that pre-suit demand was required, it was made. *See, e.g.*, *infra* at Preamble and ¶¶ 1, 4, 5, 6, 7, 9, 13, 14, 15, 16, 17, 45, 46, and 47.

## IV. TEX. R. CIV. P. 47

23.　　Pursuant to Texas Rule of Civil Procedure 47(c)(5), Plaintiffs hereby state that they are seeking monetary relief of over $1,000,000.00.

## V. PARTIES

24.　　Plaintiff VTX Communications, LLC is a Texas limited liability company with its principal place of business at 881 E. Hidalgo Ave., Raymondville, Texas 78580.

25.　　Plaintiff VTX Investments, LLC is a Texas limited liability company with its principal place of business at 881 E. Hidalgo Ave., Raymondville, Texas 78580.

26.     Plaintiff SWT Unregulated Properties, Inc. is a Texas corporation with its principal place of business at 939 South Highway 55, Rocksprings, Texas 78880.

27.     Plaintiff Riviera Cellular & Telecommunications, Inc. is a Texas corporation with its principal place of business at 103 S. 8th Street, Riviera, Texas 78379.

28.     Plaintiffs and Defendants McAllen-Edinburg-Mission SMSA Limited Partnership, Texas RSA 18 Limited Partnership, and Texas RSA 19 Limited Partnership are all Delaware limited partnerships with their principal places of business in the State of Texas and may be served with process by serving their registered agent in the State of Texas, CT Corporation System, at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

29.     Defendant New Cingular Wireless PCS, LLC d/b/a AT&T Mobility is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard NE, Brookhaven, Georgia 30319-5309 and may be served with process by serving its registered agent in the State of Texas, CT Corporation System, at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

30.     Defendant AT&T Mobility Corporation is a Delaware corporation with its principal place of business at 1025 Lenox Park Boulevard NE, Brookhaven, Georgia 30319-5309 and may be served with process by serving its registered agent in the State of Georgia, CT Corporation System, at 1201 Peachtree Street, NE, Fulton, Atlanta, Georgia, 30361.

31.     Defendant Cricket Communications, LLC is a Delaware limited liability company with its principal place of business at 675 W. Peachtree Street NW, Ste. 27-310, Atlanta, Georgia 30308 and may be served with process by serving its registered agent in the State of Texas, CT Corporation System, at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

32.     Defendant Cricket Wireless, LLC is a Delaware limited liability company with its

principal place of business at 1025 Lenox Park Boulevard NE, Brookhaven, Georgia 30319-5309 and may be served with process by serving its registered agent in the State of Texas, CT Corporation System, at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

33.    Defendant AT&T Inc. is a Delaware corporation with its principal place of business at 208 S. Akard Street, Dallas, Texas 75202 and may be served with process by serving its registered agent in the State of Texas, CT Corporation System, at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

## VI. <u>JURISDICTION AND VENUE</u>

34.    The Limited Partner Plaintiffs originally brought this action in the 275th District Court of Hidalgo County, Texas (the "State Court"). Plaintiffs filed their Original Petition in State Court on October 21, 2016, and the parties litigated this action in the State Court for nearly three years.

35.    The State Court's jurisdiction over the lawsuit was proper because the amount in controversy exceeds the State Court's minimum jurisdictional requirements.

36.    The State Court's jurisdiction over the Defendants was proper because the Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas.

37.    The State Court action Venue was proper in this County because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this County.

38.    On July 3, 2019, Plaintiffs filed their Second Amended Petition in the State Court action. On August 2, 2019, the AT&T Defendants removed the action to this Court asserting federal jurisdiction under Section 802 of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1885a(g). ECF 1. The AT&T Defendants then filed a Motion to Dismiss the Limited Partners Plaintiffs' claims in the Second Amended Petition. ECF 5.  Plaintiffs responded to the Motion to

Dismiss, ECF 20, and moved to remand the action to State Court.  ECF 14.

39.     This Court concluded it has jurisdiction over this matter and denied the Motion to Remand.  ECF 48.  The Motion to Dismiss remains pending.

40.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1441(a) because the State Court lies within the McAllen Division.

## VII. CAUSES OF ACTION

### A.      BREACH OF FIDUCIARY DUTY

41.     Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1-34 as if set forth herein in their entirety.

42.     Each Limited Partner brings this cause of action individually and derivatively on behalf of its respective Partnership against AT&T.

43.     VTX is a limited partner of the McAllen Partnership, RSA 18, and RSA 19 and was a limited partner of each of these Partnerships at the time of the transactions of which the Limited Partners complain. SWT is a limited partner of RSA 18, and SWT or its corporate predecessor was a limited partner of RSA 18 at the time of the transactions of which the Limited Partners complain. Riviera is a limited partner of RSA 19 and was a limited partner of RSA 19 at the time of the transactions of which the Limited Partners complain.

44.     To the extent this cause of action is individual and/or direct, no demand is required.

45.     To the extent this cause of action is deemed derivative, any demand constituting an effort to cause AT&T Mobility, the sole general partner in each of the Partnerships, to bring this action is not likely to succeed and therefore futile.

46.     First, AT&T Mobility is not and cannot be disinterested and independent. AT&T Mobility is itself a defendant. AT&T Mobility is under common control with or controlled by the

other AT&T Defendants. Officers and employees of AT&T Mobility also serve as officers and employees of the Cricket Defendants. For example, as of the filing of Plaintiffs' Original Petition, the AT&T attorney who purported to negotiate with the Limited Partners on behalf of AT&T Mobility served as an officer of Cricket Communications, LLC, one of the Cricket Defendants competing with the Partnerships. Additionally, officers and employees of AT&T Mobility also serve as officers or employees of the AT&T entities who are counterparties with the Partnerships under the spectrum service agreements. Eric Wages, a key AT&T executive who has dealt with the Limited Partners for years and held himself out to the Limited Partners as acting in the best interests of the Partnerships, has signed spectrum service agreements on behalf of both the Partnerships and the counter-signing AT&T spectrum license holder. Moreover, apart from the commonality of officers and employees, the Defendants have a substantial financial interest in continuing to operate Cricket as a separate wireless provider so as to continue taking the Cricket revenue separate from the Partnerships. Additionally, the Defendants have a substantial financial interest in continuing to charge exorbitant usage rates for spectrum on unreasonable terms so as to continue profiting from these licenses. Additionally, the Defendants have a substantial financial interest in continuing to under- allocate revenue and over-allocate costs to the Partnerships so as to continue using the Partnerships to generate profits for themselves at the Partnerships' expense. Finally, the Defendants have a substantial financial interest in continuing to provide misleading financial and other documentation and in failing to properly disclose to the Limited Partners and properly document transactions between AT&T and the Partnerships so as to obscure the transactions making it extremely difficult, if not impossible, for the Limited Partners to understand and evaluate them.

47.     Second, the challenged transactions are not the product of a valid exercise of business

judgment. AT&T's conduct with respect to the Cricket transaction is particularly egregious and plainly constitutes gross negligence and/or willful misconduct. Consciously ignoring its duties to the Partnerships through AT&T Mobility, AT&T pursued the Cricket transaction for its own benefit, established Cricket as a separate competing wireless provider while giving Cricket access to the Partnerships' network at inappropriate rates, and retained the resulting Cricket revenues for itself with no regard for the Partnerships. AT&T's conduct with respect to the spectrum service agreements also plainly constitutes gross negligence and/or willful misconduct and is equally egregious. Even though the Partnership Agreements clearly provide that the spectrum is a Partnership asset to be transferred to the Partnerships at cost, AT&T has willfully retained the spectrum and has unilaterally imposed spectrum charges on the Partnerships at exorbitant usage rates on unreasonable terms. Additionally, AT&T has failed to allocate or has under-allocated revenue to the Partnerships and has improperly over-allocated overhead, costs, and expenses to the Partnerships. AT&T's method of pricing of Partnership services to AT&T affiliates are equally egregious and have resulted in ongoing impermissible profits to AT&T at the expense of the Partnerships, which is grossly negligent and/or willful misconduct by AT&T in the management of the Partnerships.

1.     Breach of Duty of Loyalty.

48.     AT&T Mobility has a fiduciary duty of loyalty to the Partnerships and Limited Partners under the Partnership Agreements and applicable Delaware law. Each Partnership Agreement provides that "[t]he General Partner will at all times act in the best interests of the Partnership," that "[n]either the Partners nor any of their Affiliates shall take any action inconsistent with this Agreement or contrary to the best interest of the Partnership at any time," and that the partners "pledge their best efforts and mutual cooperation to . . . provide the best and most profitable

Cellular Service." Additionally, Section 15-404(b) of the Delaware Revised Uniform Partnership Act provides that a partner has a duty of loyalty to:

> (1) . . . account to the partnership . . . for any property, profit or benefit derived by the partner in the conduct . . . of the partnership business or affairs or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;
>
> (2) . . . refrain from dealing with the partnership in the conduct . . . of the partnership business or affairs as or on behalf of a party having an interest adverse to the partnership; and
>
> (3) . . . refrain from competing with the partnership in the conduct of the partnership business or affairs . . .

49.     This fiduciary duty extends to the AT&T Defendants controlling AT&T Mobility, including AT&T Parent, because those AT&T entities exercise control over the Partnerships and Partnership property.

50.     The AT&T Defendants have breached their fiduciary duty of loyalty to the Partnerships and Limited Partners in various respects.

51.     The AT&T Defendants have breached and continue to breach their fiduciary duty of loyalty to the Partnerships by deriving and continue to derive profits and benefits by making the Partnership networks available to their affiliates including the Cricket Defendants for data roaming at cost (and sometimes at no cost) and thereby improperly benefiting AT&T to the detriment of the Partnerships.

52.     The AT&T Defendants have further breached and continue to breach their fiduciary duty of loyalty to the Partnerships and Limited Partners by appropriating for themselves the Cricket opportunity in the Partnerships' service area and by using the Partnerships' network to enhance and profit from the opportunity at the expense of the Partnerships. AT&T has caused the Partnerships to provide network access to Cricket for rates favorable to Cricket even though

Cricket is improperly directly competing with the Partnerships. These rates are not entirely fair to the Partnerships and Limited Partners, being lower than the rates charged in comparable situations to other companies, failing to account for AT&T's appropriation of the Cricket business opportunity and the superiority of the Partnerships' network. Moreover, these rates are periodically and unilaterally reduced to the economic benefit of AT&T. Through Cricket, AT&T is also in open competition with the Partnerships in the Partnership service areas, marketing to existing and potential Partnership customers and causing Partnership customers to disconnect in favor of service through Cricket. Finally, AT&T has failed to account to the Partnerships the full property, profits, and benefits derived by AT&T from the Cricket opportunity, from utilizing the Partnerships' network to operate Cricket as a separate wireless provider, and from competing with the Partnerships in their service areas.

53.    The AT&T Defendants have further breached their fiduciary duty of loyalty to the Partnerships and Limited Partners by failing to transfer (or failing to cause other AT&T entities to transfer) rightful Partnership spectrum to the Partnerships and by charging the Partnerships unfair, exorbitant usage rates for that spectrum on unreasonable terms. The AT&T Defendants have failed to account to the Partnerships for the full property, profits and benefits derived by AT&T and their affiliated entities from purchasing and retaining the spectrum.

54.    The AT&T Defendants have further breached their fiduciary duty of loyalty to the Partnerships and Limited Partners by failing to allocate or under-allocating revenue to the Partnerships and by improperly over-allocating overhead, costs, and expenses to the Partnerships causing substantial increases in these allocations and resulting in AT&T impermissibly profiting from the allocations. Additionally, the AT&T Defendants have breached their fiduciary duty of loyalty to the Partnerships and Limited Partners by allocating the costs and expenses associated

with AT&T's and AT&T's entities' wrongful actions to the Partnerships.

55.     In light of AT&T's wrongful actions as set forth above, the AT&T Defendants have further breached their fiduciary duty of loyalty to the Partnerships and Limited Partners by providing financial statements that obscure financial performance and by failing to properly disclose to the Limited Partners and properly document transactions of AT&T entities with the Partnerships, further obscuring those related party transactions with the Partnerships.

56.     The AT&T Defendants have acted with gross negligence and have committed willful misconduct in breaching their fiduciary duty of loyalty to the Partnerships and Limited Partners.

57.     As a result of the AT&T Defendants' various and continuing breaches of their fiduciary duty of loyalty to the Partnerships and Limited Partners, the Partnerships and the Limited Partners have suffered, and will continue to suffer, substantial financial harm.

       2.   <u>Breach of Duty of Care</u>.

58.     AT&T Mobility has a fiduciary duty of care to the Partnerships and Limited Partners under the Partnership Agreements and applicable Delaware law. Each Partnership Agreement provides that "[t]he General Partner will at all times act in the best interests of the Partnership," that "[n]either the Partners nor any of their Affiliates shall take any action inconsistent with this Agreement or contrary to the best interest of the Partnership at any time," and that the partners "pledge their best efforts and mutual cooperation to . . . provide the best and most profitable Cellular Service." Additionally, Section 15-404(c) of the Delaware Revised Uniform Partnership Act provides that a partner has a duty of care to "[refrain] from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law," and well-established Delaware law recognizes that where a partner is subject to a conflict of interest with respect to a transaction, the partner must demonstrate that the transaction is "entirely fair" to the

non-participating partners to establish compliance with its fiduciary duty of care with respect to the transaction.

59.    This fiduciary duty extends to the AT&T Defendants controlling AT&T Mobility, including AT&T Parent, because those AT&T entities exercise control over the Partnerships and the Partnerships' property.

60.    The AT&T Defendants have breached their fiduciary duty of care to the Partnerships and Limited Partners. AT&T bears the burden of demonstrating that its affiliate transactions were, are, and will continue to be "entirely fair" to the Limited Partners.

61.    The AT&T Defendants have breached their duty of care by making the Partnership networks available to AT&T affiliates including the Cricket Defendants for data roaming at cost (and sometimes at no cost) to AT&T's benefit and Plaintiffs' detriment.

62.    The AT&T Defendants have further breached their duty of care by acquiring and operating Cricket in competition with the Partnerships in their respective service areas. Further, in dealing with Cricket on behalf of each Partnership, the AT&T Defendants have permitted Cricket to use the Partnership network on terms and for prices that are unfair to the Partnership. Contrary to the requirements of the Partnership Agreements, there are no written agreements or terms to document the terms of use of the Partnership networks. Additionally, Cricket is provided access to the Partnership network at rates determined and adjusted by AT&T at any time and at its sole discretion. As set forth above, these rates are much lower than rates charged to companies in comparable situations, fail to account for AT&T's appropriation of the Cricket business opportunity and the superiority of the Partnerships' network, and are subject to reduction by AT&T at any time and without notice to or consent from the Limited Partners.

63.    The AT&T Defendants have further breached their fiduciary duty of care to the

Partnerships by failing to transfer (or failing to cause other AT&T entities to transfer) rightful Partnership spectrum to the Partnerships and by charging the Partnership exorbitant usage rates for that spectrum on unreasonable terms.

64.     The AT&T Defendants have further breached their fiduciary duty of care to the Partnerships and Limited Partners by failing to allocate or under-allocating revenue to the Partnerships and by improperly over-allocating overhead, costs, and expenses to the Partnerships causing a substantial increase in these allocations and resulting in AT&T impermissibly profiting from the allocations. Additionally, the AT&T Defendants have breached their fiduciary duty of care to the Partnerships and Limited Partners by allocating the costs and expenses associated with AT&T's wrongful actions to the Partnerships.

65.     In light of AT&T's wrongful actions as set forth above, the AT&T Defendants have further breached their fiduciary duty of care to the Partnerships and Limited Partners by providing financial statements that obscure financial performance and by failing to properly disclose to the Limited Partners and properly document AT&T's transactions with the Partnerships.

66.     The AT&T Defendants have acted with gross negligence and have committed willful misconduct in breaching their fiduciary duty of care to the Partnerships and Limited Partners.

67.     As a result of the AT&T Defendants' various and continuing breaches of their fiduciary duty of care to the Partnerships and Limited Partners, the Partnerships and the Limited Partners have suffered, and will continue to suffer, substantial financial harm.

       3.      <u>Breach of the Duties of Good Faith, Fair Dealing, and Candor</u>

68.     AT&T Mobility has duties of good faith, fair dealing, and candor to the Partnerships and Limited Partners under the Partnership Agreements and Delaware law. Each Partnership

Agreement provides that "any transaction between the Partnership and the Partners or their Affiliates shall be documented and shall become part of the records of the Partnership," and that, where the general partner or its affiliates contracts or otherwise deals with the Partnerships, "the terms and conditions of such transactions [shall be] comparable to, or not substantially less favorable than, similar arms'-length transactions between the General Partner or its Affiliate and unrelated third parties." Additionally, the fiduciary duty of loyalty includes the duties of good faith, fair dealing and candor because, in dealing with the Partnership, a partner must disclose its superior information with respect to the subject transaction. The fiduciary duty of care also includes the duties of good faith, fair dealing, and candor because, where a partner is required to establish that the terms and price of a subject transaction are entirely fair to the Partnership, the partner must disclose information showing the basis of the terms and the price.

69.    These fiduciary duties extend to the AT&T Defendants controlling AT&T Mobility including AT&T Parent because those AT&T entities exercise control over the Partnerships and the Partnerships' property.

70.    The AT&T Defendants have breached their fiduciary duties of good faith, fair dealing, and candor to the Partnerships and Limited Partners either by non-disclosure or obscuring and failing to adequately disclose AT&T's imposition of the data cost sharing process which allows AT&T affiliates including Cricket to use the Partnership network for data roaming at cost (and sometimes at no cost) with the resulting revenues and profits accruing solely to AT&T and its affiliates.

71.    The AT&T Defendants have further breached and continue to breach their fiduciary duties of good faith, fair dealing, and candor to the Partnerships and Limited Partners by retaining the Cricket business opportunity, using it to compete with the Partnerships, using

Partnership assets for the benefit of Cricket at favorable pricing to Cricket and unfair pricing to the Partnership, unilaterally reducing the pricing charged, failing to disclose to the Limited Partners all relevant information regarding the Cricket business opportunity, and other actions with respect to Cricket adverse to the interests of the Partnerships and Limited Partners.

72.     The AT&T Defendants have further breached their fiduciary duties of good faith, fair dealing, and candor to the Partnerships and Limited Partners as to the spectrum used by the Partnerships in the Partnership service areas by: (i) failing to transfer to the Partnerships (or failing to cause other AT&T entities to transfer to the Partnerships) Partnership spectrum that is used and useful to the Partnerships and instead contracting with the AT&T affiliates to charge the Partnerships for that spectrum upon terms that are not entirely fair to the Partnerships and Limited Partners; and (ii) failing to disclose to the Limited Partners all relevant information regarding these transactions, including whether the charged spectrum is actually in use by the Partnerships.

73.     The AT&T Defendants have further breached and continue to breach their fiduciary duties of good faith, fair dealing and candor to the Partnerships and Limited Partners with respect to the failure to allocate revenue to the Partnerships, the improper allocations of overhead, costs, and expenses to the Partnerships, the pricing of Partnership services, the failure to properly disclose to the Limited Partners related party transactions, and other aspects of the management and operations of the Partnerships and by providing misleading, erroneous and incomplete financial statements obscuring the financial performance of the Partnerships and the consequences of transactions with AT&T affiliates.

74.     The AT&T Defendants have acted with gross negligence and have committed willful misconduct in breaching their fiduciary duties of good faith, fair dealing and candor to the

Partnerships and Limited Partners.

75.     As a result of the AT&T Defendants' various breaches of their fiduciary duties of good faith, fair dealing and candor to the Partnerships and Limited Partners, the Partnerships and the Limited Partners have suffered, and will continue to suffer, substantial financial harm.

    4.     <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

76.     AT&T Mobility is bound by an implied covenant of good faith and fair dealing under the Partnership Agreements, is the sole general partner of each Partnership, and is responsible for the performance and enforcement of the Partnership Agreements. Accordingly, AT&T Mobility is prohibited from acting arbitrarily or unreasonably with respect to the Partnerships and Limited Partners and is prohibited from frustrating the "fruits of the bargain" that the Limited Partners reasonably expect from the Partnership Agreements.

77.     This implied covenant extends to the AT&T Defendants controlling AT&T Mobility including AT&T Parent because those AT&T entities exercise control over the Partnerships and the Partnerships' property.

78.     The AT&T Defendants have breached and continue to breach the implied covenant of good faith and fair dealing either by non-disclosure, obscuring and/or failing to adequately disclose AT&T's imposition of the data cost sharing process which allows AT&T affiliates including Cricket to use the Partnership network for data roaming at cost (and sometimes at no cost) with the resulting benefits accruing solely to AT&T and its affiliates to the detriment of the Partnerships.

79.     The AT&T Defendants have further breached the implied covenant of good faith and fair dealing by retaining the Cricket business opportunity, using it to compete with the Partnerships, using Partnership assets for the benefit of Cricket at favorable pricing to Cricket and unfair

pricing to the Partnership, unilaterally reducing the pricing charged, failing to disclose to the Limited Partners all relevant information regarding the Cricket business opportunity, and other actions with respect to Cricket adverse to the interests of the Partnerships and Limited Partners.

80.     The AT&T Defendants have further breached and continue to breach the implied covenant of good faith and fair dealing as to the spectrum used by the Partnerships in the Partnership service areas by: (i) failing to transfer to the Partnerships (or failing to cause other AT&T entities to transfer to the Partnerships) Partnership spectrum that is used and useful to the Partnerships and instead contracting with the AT&T affiliates to charge the Partnerships for that spectrum upon terms that are not entirely fair to the Partnerships and Limited Partners; and (ii) failing to disclose to the Limited Partners all relevant information regarding these transactions, including whether the charged spectrum is actually in use by the Partnerships.

81.     The AT&T Defendants have further breached and continue to breach the implied covenant of good faith and fair dealing with respect to the failure to allocate revenue to the Partnerships, the improper allocations of overhead, costs, and expenses to the Partnerships, the pricing of Partnership services, the failure to properly disclose to the Limited Partners related party transactions, and other aspects of the management and operations of the Partnerships and by providing misleading, erroneous and incomplete financial statements obscuring the financial performance of the Partnerships and the consequences of transactions with AT&T affiliates.

82.     The AT&T Defendants have acted with gross negligence and have committed willful misconduct in breaching the implied covenant of good faith and fair dealing.

83.     As a result of the various breaches of the implied covenant of good faith and fair dealing under the Partnership Agreements by the AT&T Defendants, the Partnerships and the Limited Partners have suffered, and will continue to suffer, substantial financial harm.

### B.        BREACH OF PARTNERSHIP AGREEMENTS

84.    Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1-77 as if set forth herein in their entirety.

85.    With respect to AT&T's imposition of the data cost sharing process, AT&T Mobility has breached and continues to breach the express terms of the Partnership Agreements which provide, among other things, that (i) "[t]he General Partner will at all times act in the best interests of the Partnership," (ii) "[n]either the Partners nor any of their Affiliates shall take any action inconsistent with this Agreement or contrary to the best interest of the Partnership at any time," and (iii) the Partners "pledge their best efforts and mutual cooperation to . . . provide the best and most profitable Cellular Service…," AT&T Mobility has also breached the express terms of the RSA-18 and RSA-19 Partnership Agreements which provide that AT&T's affiliate transactions must be "comparable to, or not substantially less favorable than, similar arms-length transactions between the General Partner or its Affiliates and unrelated third parties."

86.    With respect to AT&T's actions as to Cricket, AT&T Mobility has breached and continues to breach the express terms of the Partnership Agreements which provide, among other things, that (i) "[t]he General Partner will at all times act in the best interests of the Partnership," (ii) "[n]either the Partners nor any of their Affiliates shall take any action inconsistent with this Agreement or contrary to the best interest of the Partnership at any time," (iii) the Partners "pledge their best efforts and mutual cooperation to . . . provide the best and most profitable Cellular Service…," and (iv) AT&T's competitive activities are restricted to locations outside the Partnership services areas by providing that "the General Partner or an Affiliate [may provide] Cellular Service . . . independently from the Partnership in areas other than the [Partnership's service area].".

87.     With respect to AT&T's actions as to spectrum used and useful to the Partnerships in the Partnership service areas, AT&T Mobility has breached and continues to breach the express terms of the Partnership Agreements which provide, among other things, that (i) "[t]he General Partner shall, on behalf of the Partnership . . . cause to be transferred to the Partnership's name all licenses, permits, or other regulatory approvals necessary to provide Cellular Service," and (ii) "[t]he General Partner shall not be entitled to any profit in rendering . . . services to the Partnership."

88.     With respect to AT&T's failure to allocate revenue to the Partnerships, AT&T Mobility has breached and continues to breach the express terms of the Partnership Agreements which provide, among other things, that (i) "[t]he General Partner will at all times act in the best interests of the Partnership," (ii) "[n]either the Partners nor any of their Affiliates shall take any action inconsistent with this Agreement or contrary to the best interest of the Partnership at any time," (iii) the Partners "pledge their best efforts and mutual cooperation to . . . provide the best and most profitable Cellular Service…," and (iv) the Limited Partners have the right to "[h]ave on demand true and full information of all things affecting the Partnership." With respect to the cost allocations made to the Partnerships and other affiliate transactions, AT&T Mobility has breached and continues to breach the express terms of the Partnership Agreements which provide, among other things, that (i) "the General Partner shall be reimbursed by the Partnership[s] . . . for any reasonable and necessary expenses incurred by the General Partner on behalf of the Partnership," (ii) "[t]he General Partner shall not be entitled to any profit in rendering . . . services to the Partnership," and (iii) the Limited Partners have the right to "[h]ave on demand true and full information of all things affecting the Partnership."

89.     With respect to the documentation, records and financial reporting of AT&T Mobility, AT&T Mobility has breached and continues to breach the express terms of the Partnership Agreements which provide, among other things, that (i) "the General Partner shall keep . . . full and accurate accounts of the transactions of the Partnership in proper books of account in accordance with generally accepted accounting principles" (ii) "any transaction between the Partnership and Partners or their Affiliates shall be documented and shall become part of the records of the Partnership," and (iii) the Limited Partners have the right to "[h]ave on demand true and full information of all things affecting the Partnership."

90.     As a result of AT&T Mobility's various breaches of the Partnership Agreements, the Partnerships and the Limited Partners have suffered, and will continue to suffer, substantial financial harm.

**C.     TORTIOUS INTERFERENCE**

91.     Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1-84 as if set forth herein in their entirety.

92.     The Partnership Agreements constitute contracts between the Limited Partners and AT&T Mobility, and accordingly, the AT&T Defendants (other than AT&T Mobility) and the Cricket Defendants have a duty to refrain from willfully and intentionally interfering with the Partnership Agreements.

93.     The AT&T Defendants (other than AT&T Mobility) willfully and intentionally interfered and continue to interfere with the Partnership Agreements by participating in and/or benefiting from the data cost sharing process discussed above. The AT&T Defendants (other than AT&T Mobility) and the Cricket Defendants also willfully and intentionally interfered and continue to interfere with the Partnership Agreements: (a) by operating Cricket, or permitting Cricket to be

operated, as a separate wireless provider in the Partnerships' service territory notwithstanding their conscious knowledge that AT&T Mobility and its affiliates were contractually bound to refrain from providing competing wireless service in the Partnerships' service area; and (b) by causing or permitting Cricket to pay the Partnerships inadequate fees for the use of the Partnerships' respective networks. The AT&T Defendants (other than AT&T Mobility) controlling the AT&T entities holding the overlap spectrum licenses also willfully and intentionally interfered and continue to interfere with the Partnership Agreements by causing the Partnerships to refrain from securing ownership of the spectrum licenses as and when acquired and by causing the Partnerships to enter into the spectrum service agreements imposing exorbitant usage charges on the Partnerships for that spectrum. Finally, AT&T Parent as the ultimate controlling parent of the AT&T Defendants was involved in all of the interference described above and further willfully and intentionally interfered and continue to interfere with the Partnership Agreements by failing to allocate or under-allocating revenue to the Partnerships and improperly over-allocating overhead, costs, and expenses to the Partnerships to generate impermissible profits for itself.

94.     As a result of the AT&T Defendants' and Cricket Defendants' tortious interference with the Partnership Agreements, the Partnerships and the Limited Partners have suffered, and will continue to suffer, substantial financial harm.

**D.     CONVERSION/CIVIL THEFT**

95.     Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1-88 as if set forth herein in their entirety.

96.     The AT&T Defendants and the Cricket Defendants deprived and continue to deprive the Partnerships of customers – namely, the Cricket customers who rightfully belong to the

Partnerships – and the corresponding revenues lawfully belonging to the Partnerships and the Limited Partners, which actions constitute conversion/civil theft against the Partnerships and/or the Limited Partners.

97.     The AT&T Defendants deprived and continue to deprive the Partnerships of spectrum licenses required by the Partnership Agreements and Delaware law to be transferred to the Partnerships, which actions constitute conversion/civil theft against the Partnerships and/or the Limited Partners.

98.     As a result of the conversion/civil theft, the Partnerships and Limited Partners have suffered, and will continue to suffer, substantial financial harm.

**E.     AIDING AND ABETTING**

99.     Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1-92 as if set forth herein in their entirety.

100.    The AT&T Defendants and the Cricket Defendants knowingly induced and participated in the breach of fiduciary duties to the Partnerships and Limited Partners, which action constitutes aiding and abetting such wrongful conduct on the part of the AT&T Defendants and the Cricket Defendants.

101.    As a result of the aiding and abetting, the Partnerships and the Limited Partners have suffered, and will continue to suffer, substantial financial harm.

**F.     FRAUD**

102.    Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1-95 as if set forth herein in their entirety.

103.    Certain of the representations made by the AT&T Defendants described herein constitute fraud. The AT&T Defendants made material misrepresentations to the Limited Partners, which

were known by the AT&T Defendants to be false at the time they were made. The AT&T Defendants intended that the Limited Partners would rely and act on the misrepresentations, which the Limited Partners did. As set forth more particularly herein, the AT&T Defendants' misrepresentations caused injury to Plaintiffs.

104.    Additionally, the AT&T Defendants concealed or failed, and continue to conceal or fail, to disclose material information related to all of the transactions described herein. The AT&T Defendants deliberately failed to disclose material facts regarding these transactions and in some cases deliberately failed to disclose the transaction at all. The AT&T Defendants failed to make these disclosures despite having fiduciary duties of complete candor to the Limited Partners through AT&T Mobility and despite having legal and contractual duties of "true and full" disclosure under the Partnership Agreements. The Limited Partners were ignorant of these facts and had no opportunity to discover them, and, by failing to disclose these facts, the AT&T Defendants intended the Limited Partners to refrain from acting to address AT&T's misconduct. Finally, the Limited Partners did in fact rely on the various non-disclosures and trusted that their General Partner had acted at all times in accordance with its fiduciary duties and with complete candor up until the time the Limited Partners filed this lawsuit. By the time the Limited Partners filed this lawsuit, many of the wrongful and self-dealing transactions were fully matured and were ingrained into AT&T's business plans, business operations, systems of accounting, and other systems for dealing with the Partnerships. These transactions include schemes to squeeze out AT&T's cellular partners,[2] the AT&T Defendants' implementation of the data cost sharing process, the AT&T Defendants' and their affiliates' acquisition of spectrum and imposition of spectrum charges on the Partnerships, the AT&T Defendants' acquisition and operation of

---

[2] Plaintiffs are aware of AT&T identifying and designating the squeeze out scheme as "Project Smoothie" and "Project Smoothie II," although AT&T may have also labeled the plan under other additional names and projects.

Cricket through the Cricket Defendants, and the AT&T Defendants' use of the Partnership networks to generate and support additional revenue streams in which the Partnerships do not participate or adequately participate. This continuing concealment and failure to disclose has continued since at least 2009 with the development of AT&T's squeeze out schemes and continues today despite the Limited Partners' continued requests for information, both in the context of this lawsuit and independently. This concealment and failure to disclose is attributable to all the AT&T Defendants and is particularly attributable to AT&T Parent as the ultimate controlling parent of the AT&T Defendants.

105.    As a result of this fraudulent conduct, the Partnerships and the Limited Partners have suffered, and will continue to suffer, substantial financial harm.

## VIII. DAMAGES AND EQUITABLE RELIEF

106.    Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1-99 as if set forth herein in their entirety.

107.    Plaintiffs request that this Court require Defendants to account to Plaintiffs under the Partnership Agreements and applicable law and to otherwise account for damages to Plaintiffs.

108.    Plaintiffs request that this Court enter an injunction or other appropriate special relief against Defendants requiring Defendants to disgorge all profits attributable to Defendants' wrongful conduct as set forth herein, to comply with the applicable Defendants' fiduciary duties to the Partnerships and Limited Partners, and to comply with the Partnership Agreements.

109.    Plaintiffs request that this Court require Defendant AT&T Mobility to indemnify the Partnerships for AT&T Mobility's gross negligence and willful misconduct as required by the Partnership Agreements.

110.    Plaintiffs request that this Court enter judgment for damages against the Defendants to be paid to the Plaintiffs for:

      a.    the economic damages to Plaintiffs, including, without limitation, special, incidental, and consequential damages and lost profits, attributable to Defendants' wrongful acts and omissions;

      b.    exemplary damages;

      c.    Plaintiffs' reasonable expenses and attorneys' fees for presenting this action;

      d.    pre- and post- judgment interest at the highest rate permitted by law; and

      e.    any and all other relief to which Plaintiffs may justly be entitled.

111.     Plaintiffs further request that, to the extent any of the foregoing damages have accrued to the Partnerships, the Court require such damages to be paid to the Limited Partners to the fullest extent permitted by applicable law.

## IX. <u>REQUEST FOR JURY TRIAL</u>

112.    Plaintiffs have demanded a jury trial and tendered the appropriate fee.

## X. **PRAYER**

For these reasons, Plaintiffs ask that the Court issue citation for Defendants to appear and answer, and that Plaintiffs be awarded a judgment against Defendants for the damages plead herein and all other relief to which Plaintiffs are entitled.

Respectfully Submitted,

/s/ Larry Warren
Larry Warren (Attorney-in-Charge)
Southern District No. 13994
State Bar No. 20888450
lwarren@namanhowell.com
NAMAN, HOWELL, SMITH & LEE, PLLC
Union Square II
10001 Reunion Place, Ste. 600
San Antonio, Texas 78216
(210) 731-6300
FAX (210) 785-2975

Stephanie S. Potter (Of Counsel)
Texas State Bar No. 24065923
Southern District No. 1724931
spotter@namanhowell.com
Michael S. Duncan (Of Counsel)
Texas State Bar No. 24097628
Southern District No. 3455499
mduncan@namanhowell.com
Curt Kurhajec (Of Counsel)
Admitted *Pro Hac Vice*
State Bar No. 11767200
ckurhajec@namanhowell.com
NAMAN, HOWELL, SMITH & LEE, PLLC
8310 N. Capital of Texas Hwy., Ste. 490
Austin, Texas 78731
(512) 479-0300
FAX (512) 474-1901

and

R.D. Guerra (Of Counsel)
Southern District No. 5949
State Bar No. 08578640
rdguerra@guerraleeds.com
Joe Hernandez (Of Counsel)
Southern District No. 15145
State Bar No. 09517700
jhernandez@guerraleeds.com
GUERRA, LEEDS, SABO & HERNANDEZ,
PLLC
10213 N. 10th Street
McAllen, Texas 78504
(956) 383-4300
FAX (956) 383-4304

**ATTORNEY FOR PLAINTIFFS,**
**VTX COMMUNICATIONS, LLC AND VTX**
**INVESTMENTS, LLC** individually and
derivatively on behalf of the McAllen-Edinburg-
Mission SMSA Limited Partnership, Texas RSA 18
Limited Partnership, and Texas RSA 19 Limited
Partnership

James Hartnett, Jr. (Attorney-in-Charge)
Southern District No. 30132
State Bar No. 09169200
jim@hartnettlawfirm.com
Will Hartnett (Of Counsel)
Southern District No. 3441593
State Bar No. 09170200
will@hartnettlawfirm.com
Jay David Hartnett (Of Counsel)
Southern District No. 3441587
Texas State Bar No. 09169300
THE HARTNETT LAW FIRM
The Hartnett Building
2920 N. Pearl Street
Dallas, Texas 75201
(214) 742-4655
FAX (214) 855-7857

**ATTORNEYS FOR PLAINTIFF,**
**SWT UNREGULATED PROPERTIES, INC.**
individually and derivatively on behalf of Texas
RSA 18 Limited Partnership

Mike Mills (Attorney-in-Charge)
Southern District No. 1211
State Bar No. 14163500
mkmills@atlashall.com
Susan Sullivan (Of Counsel)
Southern District No. 13144
State Bar No. 11546700
ssullivan@atlashall.com
ATLAS HALL RODRIGUEZ
818 Pecan Street
McAllen, Texas 78501
(956) 682-5501
FAX (956) 686-6109

**ATTORNEYS FOR PLAINTIFF,
RIVIERA CELLULAR &
TELECOMMUNICATIONS, INC.** individually
and derivatively on behalf of Texas RSA 19
Limited Partnership

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that a copy of the foregoing was sent by electronic service in accordance with the Federal Rules of Civil Procedure to the following on May 5, 2020.

**COUNSEL FOR DEFENDANTS:**

*Via the CM/ECF Service or Via Email*
Marty L. Brimmage, Jr.
Kendrea Tannis
Lacy M. Lawrence
Laura P. Warrick
Brennan H. Meier
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
mbrimmage@akingump.com
ktannis@akingump.com
llawarence@akingump.com
lwarrick@akingump.com
bmeier@akingump.com

*Via the CM/ECF Service or Via Email*
Zoe K. Wilhelm
FAEGRE DRINKER BIDDLE & REATH, LLP
1800 Century Park East, Ste. 1500
Los Angeles, CA 90067
Zoe.wilhelm@faegredrinker.com

*Via the CM/ECF Service or Via Email*
Gil P. Peralez
Chris Franz
PERALEZ FRANZ LLP
1416 Dove Avenue
McAllen, Texas 78594
Service Email: service@peralezfranzlaw.com
gpp@peralezfranzlaw.com
ccf@peralezfranzlaw.com

*Via the CM/ECF Service or Via Email*
Charles Blanchard
Roderick L. Wilson
AT&T SERVICES, INC.
208 S. Akard Street. Rm. 3111
Dallas, Texas 75202
Charles.blanchard@att.com
Roderick.wilson.1@att.com

/s/ Larry Warren