United States District Court
Southern District of Texas
**ENTERED**
February 21, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| VTX COMMUNICATIONS, LLC, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. 7:19-cv-00269 |
| AT&T INC., et al., | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

The Court now considers "Defendants' Motion for Summary Judgment,"[1] "Plaintiffs' Motion for Partial Summary Judgment and Alternative Motion for Pre-Trial Finding on Burden Shifting,"[2] and all parties' responses,[3] replies,[4] and exhibits. After considering the motions, record, and relevant authorities, the Court **GRANTS IN PART** and **DENIES IN PART** each motion.

A note on citations: ordinarily, this Court refers to evidence by its place on the electronic docket. However, due to the voluminous evidence in this case, the Court will refer to exhibits by the designation and pagination given by the parties. Citations to previous filings and Court orders will still refer to the electronic docket.

---

[1] Dkt. No. 80.
[2] Dkt. No. 84.
[3] Dkt. Nos. 90, 93.
[4] Dkt. Nos. 103, 108.

TABLE OF CONTENTS

I.    FACTUAL AND PROCEDURAL HISTORY ........................................................................ 3

II.   LEGAL STANDARD ....................................................................................................... 8

III.  DISCUSSION ................................................................................................................ 9

    A.   **Time bar to Plaintiffs' claims** ........................................................................... 9

    B.   **Claims against the General Partner** ............................................................... 15

        1.    *Judicial review of self-dealing transactions* ............................................. 15

            a.    Breach of fiduciary duties standard ................................................ 17

                i.    Exculpation under section 16.1 .............................................. 17

            b.    Breach of contract standard ............................................................ 22

                i.    Scope of the safe harbor under 7.5 ........................................ 22

                ii.   Judicial review of self-dealing transactions under section 7.5 ........... 26

                iii.  Exculpation under section 16.1 .............................................. 28

        2.    *Application* ............................................................................................ 29

            a.    Data cost sharing methodology ...................................................... 29

            b.    Cricket arrangement ....................................................................... 33

            c.    Spectrum Services Agreement ........................................................ 41

            d.    Other revenue streams .................................................................... 48

    C.   **Claims against Non-Partner Defendants** ....................................................... 49

        1.    *Breach of the duty of loyalty* .................................................................. 49

            a.    AT&T Inc. ....................................................................................... 49

            b.    AT&T Mobility Corp. ..................................................................... 51

            c.    Cricket ............................................................................................ 52

        2.    *Conversion* ........................................................................................... 54

        3.    *Tortious interference* ............................................................................ 55

IV.   CONCLUSION AND HOLDING ...................................................................................... 58

## I. Factual and Procedural History

Partners "owe to one another, while the enterprise continues, the duty of the finest loyalty."[5] This case investigates the duties owed by the General Partner, an AT&T affiliate, to the Limited Partners, now Plaintiffs.

The dispute arises out of three telecommunications partnerships involving VTX, SWT, and Riviera as Limited Partners and New Cingular Wireless PCS, LLC d/b/a AT&T Mobility as the General Partner. In the 1980s, the Federal Communications Commission ("FCC") issued licenses for mobile cellular service pursuant to 47 CFR Part 22 through a lottery system. The Limited Partners won the lottery for their geographic areas,[6] and formed the Partnerships with what was then Cingular, now AT&T. These Partnerships are the McAllen-Edinburg-Mission SMSA Limited Partnership (the "McAllen Partnership" or "McAllen"), the Texas RSA 18 Limited Partnership ("RSA 18"), and the Texas RSA 19 Limited Partnership ("RSA 19"). Plaintiff VTX is a Limited Partner in all three, Plaintiff SWT is a Limited Partner only in RSA 18, and Plaintiff Riviera is a Limited Partner only in RSA 19.

Building out the infrastructure necessary to provide cellular service in the Partnership area was the responsibility of the Partnership, but continuing business operations fell to the General Partner and its affiliated carrier.[7] The General Partner was contractually granted latitude to make business decisions on behalf of the Partnerships.[8] The tangible assets (like towers) and the intangible assets (like spectrum licenses) form the Partnerships' networks. In some parts of the

---

[5] *Meinhard v. Salmon*, 249 N.Y. 458, 463-64 (1928) (J. Cardozo).
[6] Plaintiffs' Ex. 32.
[7] Partnership Agreements 4.1-4.2, Plaintiffs' Exs. 16-18.
[8] *Id.*

country, AT&T owns the entire network through a subsidiary.[9] But in other geographic areas, it provides cellular service through a partnership with limited partners, as here.

Throughout the lifespan of these Partnership Agreements, the precise nature of networks and the services provided by the Partnerships has changed with the times. To this day, the Partnerships continue to incur costs to construct and maintain the equipment to provide the latest iteration of cellular service.[10]

But with time, AT&T began to see the Partnerships as dead weight.[11] As early as 2000,[12] AT&T launched a business plan under the name of Project Smoothie or Project LESS that aimed to cut distributions to Limited Partners.[13] Early iterations of the plan focused on roll-up and buyout scenarios,[14] but AT&T ultimately considered squeeze out options as well.[15] Whether AT&T's dealings with the Plaintiffs thereafter should be understood in the context of Project Smoothie is a matter of contention in this case.

To make sense of the relevant transactions in this case, one must understand a bit about the parties' consumer-facing business. Traditionally, AT&T customers had postpaid service plans and if they lived within the Partnership service area, then they were "homed" there, received a local phone number, and became Partnership customers. The Partnerships made money by having customers. For example, when Cingular (the old General Partner) and AT&T (the new General Partner) merged in 2004, AT&T customers and assets in the Partnership's service areas were contributed to the Partnerships.[16]

---

[9] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 34-35.
[10] *See* Plaintiffs' Exs. 28-30.
[11] *See* Deposition of John Stephens, Plaintiffs' Ex. 132 at 91-92 (referring to entity streamlining and simplification and reduced cash outlays).
[12] *Id.* at 89. Documentary evidence of the Project presented here begins around 2009.
[13] Plaintiffs' Ex. 71.
[14] *Id.*
[15] Plaintiffs' Ex. 68.
[16] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 107.

Non-homed cellular users—whether they be another carrier's customers or AT&T customers from outside a Partnership's service area—were said to be "roaming" on the Partnership network when they used it. Cellular carriers and network owners created various agreements over time to compensate each other when their customers roamed on each other's networks.[17]

In 2010, as the industry saw the potential of wireless data to provide mobile internet connectivity, the General Partner adopted (on behalf of the Partnerships) the data cost sharing methodology for allocating costs between AT&T affiliates and the Partnerships. Under that system, the Partnerships would continue receiving a roaming rate for voice roaming on their networks, but would be compensated at cost for data roaming.[18]

Thereafter, AT&T merged its own prepaid line with Cricket, christening New Cricket in 2014. In contrast to the contribution of postpaid customers in Cingular's 2004 acquisition of AT&T, Cricket customers homed in the Partnership area did not become Partnership customers.[19] Instead, AT&T adopted a new methodology to compensate the Partnerships when Cricket customers use Partnership networks. When Cricket customers "homed" inside the Partnership service areas[20] use their networks, the Partnerships are compensated at a reseller rate.[21] This is the weighted average of rates set for wholesalers to purchase a networks' surplus capacity and sell it under a different brand name (like Tracfone) to customers who otherwise would be unlikely to purchase the network's offerings.[22] Reseller rates are lower than roaming rates but higher than cost

---

[17] Plaintiff's Ex. 97 at 2.
[18] Ernst & Young Internal Memo to AT&T, Plaintiffs' Ex. 96 at 1-2.
[19] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 107.
[20] They are homed in the Partnerships' geographies, but do not become Partnership customers.
[21] Plaintiffs' Ex. 86.
[22] *See* Plaintiff's Ex. 97 at 4.

reimbursement.[23] When non-homed Cricket customers use the Partnerships' networks, the Partnerships are compensated at a roaming rate for voice, but cost for data.[24]

The overall evolution of services in this space also required new FCC licenses apart from those initially won by the Limited Partners. Below, the Court discusses the extent to which the Partnership Agreements mandated that the Partnerships (as opposed to AT&T) own those licenses. In any case, AT&T retained certain licenses and charged the Partnerships to use those frequencies pursuant to spectrum Service Agreements. In 2015, AT&T backdated the service charges and made a capital call in an attempt to squeeze VTX out of the McAllen Partnership. AT&T ultimately backed off the capital call, but the decision marked a rift between the parties that set them on a trajectory for the courtroom.

Plaintiffs sued, and their legal claims that survived the Court's order on Defendant's motion to dismiss[25] and parties' related filings are:

- Breach of contract against the General Partner;
- Breach of fiduciary duties against the General Partner;
- Breach of the duty of loyalty against Non-Partner Defendants;
- Conversion against Non-Partner Defendants; and
- Tortious interference against Non-Partner Defendants.

Plaintiffs now seek summary judgment on three self-dealing transactions: (1) the data cost sharing methodology; (2) the Cricket arrangement; and (3) the spectrum Services Agreements.[26] Defendants move for summary judgment to dismiss all claims arguing that they are time-barred, that the parties have contractually agreed to less-than-fiduciary duties, and that the elements of the various claims have not been met.[27]

---

[23] *See* Ernst & Young Internal Memo to AT&T, Plaintiffs' Ex. 96 at 4.
[24] *Infra* part III.B.2.b.
[25] Dkt. No. 60.
[26] *Id.* at 2.
[27] *See generally* Dkt. No. 80.

The General Partner as well as Non-Partner Defendants AT&T Mobility Corporation, Cricket Wireless, LLC, and Cricket Communications, LLC, are wholly owned, indirect subsidiaries of the holding company AT&T Inc.[28] But these corporate distinctions play little role in AT&T's employee's day-to-day experience; the key players in this case moved entities frequently.[29] The question of who worked where is further muddied by the fact that "[i]ndividuals who act on behalf of AT&T entities like AT&T Mobility Corporation and New Cingular Wireless PCS, LLC are employed by various affiliated payroll entities, such as AT&T Services, Inc. and AT&T Mobility Services LLC."[30] Even at the highest levels of leadership, AT&T Mobility Corporation had officers in common with AT&T Inc., which were selected for their roles and paid by AT&T Management Services Inc., one of the payroll entities.[31]

Even if job title and employing entity are not especially enlightening here, the Court hopes to provide a cast of characters that will assist in understanding the key players in the challenged actions and their roles during the relevant time:

- Randall Stephenson, CEO, AT&T
- John Stephens, CFO/VP, AT&T
- Debbie Dial, VP, AT&T
- Gregory Hall, VP of Reporting, AT&T
- Philip Teske, Accounting and Reporting, AT&T Mobility/Partnership Accounting Group
- Bradley Gifford, Director of Accounting, AT&T Mobility/Partnership Accounting Group
- Eric Wages, Partner Relations, AT&T Mobility
- Melody Deaver, Partner Relations, AT&T Mobility
- Karen DeShazor, Mobility/Partnership Accounting

---

[28] Dkt. No. 2; AT&T Inc.'s Form 10-K for fiscal year ended December 31, 2021, Exhibit 21 (accessed via EDGAR).
[29] For example, Eric Wages, a key decision-maker over the General Partner in the challenged actions here, stated the particular entity he works for as "AT&T" and testified "I am—I think an assistant secretary in a few different entities for signature purposes within AT&T." Plaintiffs' Ex. 8, Deposition of Eric Wages, at 23, 25. Similarly, the Partnerships' representative within AT&T, Melody Deaver, states that for her, "it's all AT&T." Plaintiffs' Ex. 135, Deposition of Melody Deaver, at 11. Other witnesses gave similar answers when asked their job titles.
[30] Defendants' Motion for Summary Judgment, Ex. 42.
[31] Deposition of John Stephens, Plaintiffs' Ex. 132 at 61.

- Jennifer Van Buskirk, former President of Cricket
- Ted Stine, former VP of Cricket
- Brian Muncy, Director of Finance, Cricket

- Gary Gilmer, President, SWT, Limited Partner in RSA 18
- Bill Colston, Jr., President/GM, Riviera, Limited Partner in RSA 19
- David Osborn, CEO, VTX, Limited Partner in all three Plaintiff Partnerships

Delaware courts have already found disloyalty by many of the very same characters involved in this story.[32] Still, in the foregoing pages, the Court takes up the rigorous task of giving *these* parties the deference they contracted for[33] and giving credence to the economic realities of the south Texas market, Cricket's largest customer base.[34] The Court turns to its analysis.

## II. LEGAL STANDARD

Under Rule 56, summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[35] In a motion for summary judgment, the movant bears the initial burden of showing the absence of a genuine issue of material fact.[36] The burden then shifts to the non-movant to demonstrate the existence of a genuine issue of material fact.[37] "A fact is 'material' if its resolution could affect the outcome of the action,"[38] while a "genuine" dispute is present "only if a reasonable jury could return a verdict for the non-movant."[39] As a result, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[40]

---

[32] *In re Cellular Tel. P'ship Litig.*, 2021 Del. Ch. LEXIS 224, at *54 (Ch. 2021) (specifically discussing Eric Wages and the Partnership Accounting Group).
[33] *See* APPENDIX A for relevant contractual provisions.
[34] *See* Plaintiffs' Ex. 85.
[35] Fed. R. Civ. P. 56(a).
[36] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[37] *See id.*
[38] *Burrell v. Dr. Pepper/Seven UP Bottling Grp.*, Inc., 482 F.3d 408, 411 (5th Cir. 2007) (internal quotation marks and citation omitted).
[39] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006) (citation omitted).
[40] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In conducting its analysis, the Court considers evidence from the entire record and views that evidence in the light most favorable to the non-movant.[41] Rather than combing through the record on its own, the Court looks to the motion for summary judgment and response to present the evidence for consideration.[42] Parties may cite to any part of the record, or bring evidence in the motion and response.[43] By either method, parties need not proffer evidence in a form admissible at trial,[44] but must proffer evidence substantively admissible at trial.[45]

## III. DISCUSSION

### A. Time bar to Plaintiffs' claims

Defendants assert a time bar defense to Plaintiffs' challenges to their data cost sharing methodology and, by extension, the Cricket compensation methodology. AT&T adopted this methodology in 2010 and Plaintiffs brought suit on October 21, 2016.[46] The parties agree that claims for breach of contract and breach of fiduciary duty have a four-year statute of limitations in Texas while tortious interference and conversion have a two-year limit. The Court finds adoption of the data cost sharing methodology and Cricket arrangement relate directly to the "derogation of its contractual and fiduciary duties"[47] and AT&T's "using the Partnership's network to serve [Cricket] business"[48] alleged in the Original Petition. Therefore, the claims about data cost sharing are not "wholly based on a new, distinct, or different transaction or occurrence"

---

[41] *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citations omitted).

[42] *See* Fed. R. Civ. P. 56(e).

[43] *See* Fed. R. Civ. P. 56(c).

[44] *See Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

[45] *See Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) ("[T]he evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial.").

[46] Dkt. No. 1-2.

[47] *Id.* at 2, ¶ 1.

[48] *Id.* at 4, ¶ 4.

and do relate back to the Original Petition.[49] The claims are only barred if they accrued before October 21, 2012 or 2014, depending on the claim.

The parties pontificate at length about the metaphysics of AT&T's misconduct—was it one breach when AT&T adopted the methodology, or a different breach at each distribution or capital call?—providing one case example after another. Here, the time bar issue is settled by the discovery rule without wading into those waters. Plaintiffs' claims did not accrue until they were discovered, which was after the relevant cutoff.

Under Texas law, the discovery rule is a limited exception that "applies to instances in which the nature of the plaintiff's injury is inherently undiscoverable and the evidence of injury is objectively verifiable."[50] There is a presumption of inherent undiscoverability in the fiduciary context, "although a person owed a fiduciary duty has some responsibility to ascertain when an injury occurs."[51] The rationale is that the "person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so[, but] when the fact of misconduct becomes apparent it can no longer be ignored, regardless of the nature of the relationship."[52] The statute of limitations is tolled until the party owed fiduciary duties knows or should know about the misconduct.

Here, the General Partner stands in a fiduciary relationship to the Limited Partners. Therefore, there is a presumption of undiscoverability until the conduct raises red flags that the fiduciary needs to be investigated for potential misconduct. On the one hand, the law will not impose on the Limited Partners a duty to question every move that the General Partner makes. But

---

[49] TEX. CIV. PRAC. & REM. CODE § 16.068.
[50] *Legacyrg, Inc. v. Harter*, 705 F. App'x 223, 225 (5th Cir. 2017) (citing, *inter alia*, *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929 (Tex. 2011) and *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998)).
[51] *Comput. Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996).
[52] *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996).

on the other hand, it will not continue to lend the protection of the discovery rule if the Limited Partners were willfully blind or passive in response to the misconduct they now challenge.

AT&T argues in both in its briefs and in its post-lawsuit letter to VTX[53] that the challenged conduct was disclosed to the Limited Partners through audited financials and through quarterly Partnership meetings with Melody Deaver. The Court finds that neither of these actions put the Limited Partners on notice so as to overcome the discovery rule's fiduciary flavor.

The 2010/2009 Ernst & Young ("EY") Audited Financial Statement disclosed to the Limited Partners the following:

**Data Cost Sharing**

The Partnership incurs costs in delivering data services to other AT&T Mobility affiliates' customers over the Partnership's network. Additionally, other AT&T Mobility affiliates incur costs in delivering data services to the Partnership's customers over their networks.

Beginning in July 2010, the Partnership implemented a process whereby these costs are allocated between AT&T Mobility affiliates and are reflected as either an increase or decrease in cost of services depending on the respective affiliates' customer data usage volumes. This process change occurred when the General Partner developed the billing system enhancements needed to identify affiliate data usage. The amounts allocated are based upon a rate per data kilobyte which was determined through an analysis of operating expenses associated with providing a data kilobyte. In the year ended December 31, 2020, the Partnership recorded $121 in net data expense reductions, which is reflected in "Cost of services." Prior to July 2010, data usage costs were not allocated between affiliates.[54]

The Court does not find this or any other statement in the 2010/2009 Audited Financial Statement to sufficiently tell the Limited Partners that cost netting is the *only* way that they will be compensated for data roaming. First and foremost, it is simply not on the page. The financial statement tells the Limited Partners that costs are now allocated, coinciding with a new-found ability to bill data traffic by partnership market. But it does not tell them that the new process

---

[53] Plaintiffs' Ex. 137.
[54] Defendants' Motion for Summary Judgment, Ex. 4 at 18.

supplants other compensation mechanisms, nor that the Partnerships' provision of data services to AT&T's other customers will not affect the revenue column of their balance sheets.

Second, the interpretation of the disclosure that AT&T now hopes to impute on the Limited Partners (as if it is obvious) is dramatically out of whack with the parties' course of performance. Under their arrangement, voice roaming resulted in "outcollect revenue" and "incollect expenses" booked by the network on which the customers roamed.[55] Usage was multiplied by a rate, which was set by contract. Rates in contracts with affiliates and resellers were typically lower than those in roaming contracts with other carriers.

For SMS roaming, the bill-and-keep methodology provided that a roaming subscriber's own carrier would book its roaming traffic as its revenue.[56] This methodology spawned from a technological limitation: the carriers' inability to identify whose customer it was that was roaming on its network. Bill-and-keep was problematic because its fairness depends on a roughly equal balance of traffic, and at least one court has held that AT&T's use of bill-and-keep breached a partnership agreement.[57] For all its problems, bill-and-keep was industry standard until the turn of the decade.[58]

The data cost sharing methodology was new. Like for voice roaming, data roaming would now be recognized by the network on which the customer was roaming. So when a Partnership customer roamed on the rest of AT&T's data network, the Partnership would be charged something like an incollect expense. And when a non-homed AT&T customer roamed on the Partnership network, it would receive an expense reduction somewhat similar to outcollect revenue. But unlike

---

[55] *See id.* at 9, 18, §§ 2, 5.
[56] In other words, the carriers just call it a wash.
[57] *In re Cellular Tel. P'ship Litig.*, 2021 Del. Ch. LEXIS 224, at *156-161 (Ch. 2021) (albeit a very different partnership agreement provision than those at issue here).
[58] Ernst & Young Internal Memo to AT&T, Plaintiffs' Ex. 96 at 2-3.

for voice, the Partnership was not compensated for data roaming at an intercarrier/roaming rate or even an intracompany/reseller rate. It was compensated at cost. The Partnerships did not receive revenue when serving as a provider for these non-homed AT&T customers. They were compensated "via an expense reduction."[59]

Third, data cost sharing was not industry practice, which further undercuts AT&T's claim that the Limited Partners should have understood the change. In 2009, Verizon moved away from a bill-and-keep methodology for data usage in its partnership networks. It "began recording intracompany data usage roaming activity using an estimated intracompany data roaming rate . . . consistent with the voice roaming model."[60] EY flatly informed AT&T (but notably, not the Limited Partners in the Audited Financial Statements) that "[u]nder a wholesale roaming model (versus a cost reimbursement model), the rate would presumably be in excess of the cost per kilobyte used in the Company's data cost allocation method."[61]

For these reasons, the Court holds that the disclosure in the 2010/2009 EY AFS did not fire the starting pistol for the statute of limitations under Texas law. Nor did the acquisition of Cricket and the application of a version of the data cost sharing methodology to Cricket customers roaming on the Partnerships' network. Defendants argue that the 2010/2009 EY AFS was sufficient as to Cricket compensation too.[62] The Court disagrees.

 AT&T also argues—more so directly to the Limited Partners in its post-lawsuit letter to VTX[63] and less so in its briefs—that the Limited Partners were aware of the data cost sharing methodology because of their quarterly meetings with their representative within AT&T, Melody

---

[59] *Id.* at 3.
[60] *Id.*
[61] *Id.* at 4.
[62] Dkt. No. 108 at 26, ¶¶ 32-33.
[63] Plaintiffs' Ex. 137.

Deaver. But that argument is hard to make with a straight face (perhaps why it is largely dropped from Defendant's motion) since Ms. Deaver only knew about data cost sharing in 2016. She says:

> OK – so let me make sure I understand. [South Texas] is the largest Cricket market in the company. My [operating income] margins are impacted due to this issue because we are picking up the expense for the Cricket towers and cell sites, etc. but we are not receiving any revenue from the Cricket customers. Correct?[64]

That same year, when Wanda Chapman, who appears to be part of the Partnership Accounting Group, received the Cricket data rates for a Louisiana partnership,[65] she questioned the rate saying, "I never thought about it before. I just assumed they are like any other carrier." to which Eric Wages replied "hush".[66]

So in 2016, AT&T employees were just discovering the true nature of data cost sharing. A year earlier, when Ms. Deaver suggested a "formal communication methodology" to keep the Partnerships informed of semiannual rate changes, Wages admitted lack of transparency but responded with finger-pointing.[67] Ms. Deaver's suggestion was never implemented.[68]

While Plaintiffs' other escape hatches from the statute of limitations—fraudulent concealment on a fiduciary standard and continuing violations at each distribution or capital call— have intuitive plausibility, the Court wishes not to spill ink on dicta in an already long opinion. The discovery rule puts the accrual date for the data cost sharing methodology past October 21, 2012, so it is not time barred.

A similar analysis applies with respect to Plaintiffs' claims against the Non-Partner Defendants. Below, the Court holds that AT&T Inc. and AT&T Mobility Corp. are fiduciaries

---

[64] Plaintiffs' Ex. 130; Defendants call it "absurd" to think that if Ms. Deaver, the representative for the Partnerships within AT&T, did not know data was compensated at cost, that the Partnerships did not either. Dkt. No. 108 at 26, ¶ 32. The Court notes that feigned incredulity is not a terribly effective advocacy tool.
[65] Not a plaintiff here.
[66] Plaintiffs' Ex. 110.
[67] Plaintiffs' Ex. 104.
[68] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 217.

under *USACafes*.[69] However, Cricket is not.[70] Therefore, the claims against Cricket must have actually accrued after October 21, 2014.

The Court holds that they did accrue after the cutoff. The FCC approved AT&T's merger with Leap in 2014. On November 6, 2014, VTX wrote AT&T to question the propriety of the spectrum-related capital call and to highlight that operating Leap/Cricket in competition with the Partnerships violated AT&T's duties.[71] While there may have been rumblings before this date that something fishy was going on, it was on November 6 that VTX knew that it might be injured by conversion or tortious interference on the part of Leap/Cricket and formally brought the issue to light. Therefore, it is at this point that the two-year clock start running. Plaintiffs brought suit before November 6, 2016, so these claims are not time barred either.

### B.  Claims against the General Partner

#### 1.  *Judicial review of self-dealing transactions*

By default, majority partners owe traditional fiduciary duties to minority partners under Delaware law.[72] But those duties can be modified by contract. The Delaware Revised Limited Partnership Act provides that:

> [A] partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing.[73]

Judicial review tracks the duties to which the parties have agreed.[74] "Therefore, where the Partnership Agreement provides the standard that will govern the duty owed by a General Partner

---

[69] *Infra* part III.C.1. (citing *In re USACafes, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991)).
[70] *Id.*
[71] Plaintiffs' Ex. 34.
[72] *Sonet v. Timber Company, L.P.*, Del. Ch., 722 A.2d 319, 322 (1998); *see also Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 817 A.2d 160, 167 (stating that "scrupulous adherence to fiduciary duties is normally expected.").
[73] DRULPA, 6 Del. C. § 17-1101(d).
[74] *Sonet*, 722 A.2d at 323 ("When a particular limited partnership has plainly opted out of the statutory default scheme, judicial review, in my opinion, must look to the limited partnership's distinct doctrinal foundation in contract theory.").

to its partners in self-dealing transactions, it is the contractual standard and not the default fiduciary duty of loyalty's fairness standard that exclusively controls."[75]

Here, the duty at issue is the duty of loyalty; whether and to what extent the general partner was permitted to self-deal. In this Court's order on Defendants' motion to dismiss,[76] the Court held that the General Partner owed traditional fiduciary duties to Plaintiffs under the McAllen Partnership Agreement, which does not contain a safe harbor provision for conflicted transactions.[77] As to that Agreement, Defendants now argue that the sheer number of references to the General Partner's authority in the partnership agreements, as well as their regulatory context, evince that the parties intended for the business judgment rule to apply even to conflicted transactions. But the Court has already ruled against this point.[78] The business judgment rule applies to *how* the controller maximizes the interest of the partnership, not *whether* they did so (the question in this case).

On the other hand, the RSA 18 and RSA 19 Partnership Agreements—through section 7.5—do "displace fiduciary duties."[79] Neither common law doctrines of business judgment nor entire fairness are wholly applicable once the parties have plainly opted for a contractual standard of review.[80] Therefore, Plaintiffs' claims against the General Partner arising out of those two partnership agreements are appropriately cast as breach of contract claims.

---

[75] *Gotham Partners, Ltd. P'ship v. Hallwood Realty Partners, Ltd. P'ship*, Civil Action No. 15754, 2000 Del. Ch. LEXIS 146, at *35 (Ch. 2000).
[76] Dkt. No. 60 at 42.
[77] In contrast with RSA 18 and RSA 19 at 7.5, Plaintiffs' Exs. 17-18.
[78] Dkt. No. 60 at 45.
[79] Dkt. No. 60 at 42.
[80] *Gotham Partners*, Civil Action No. 15754, 2000 Del. Ch. LEXIS 146, at *35.

a.    <u>Breach of fiduciary duties standard</u>

This Court previously held that nothing in the McAllen Partnership Agreement clearly displaces traditional fiduciary duties.[81] Quite the contrary; the obligation of the General Partner under section 8.1 to act in the best interest of the Partnership at all times serves to reinforce the fiduciary duty of loyalty.[82] Where a fiduciary's self-dealing transactions call its loyalty into question, the entire fairness standard applies.[83] That standard "has two components: fair dealing and fair price."[84] Fair dealing relates to negotiation, disclosure, and the process of the transaction, while fair price relates to economic considerations for the non-controller.[85] The two aspects, however, are not bifurcated,[86] such that an unfair process can "infect" the price and vice versa.[87] Under entire fairness review, Defendants have the burden of proof by default.[88]

i.    Exculpation under section 16.1

The three partnership agreements each include a provision titled "Exculpation of the General Partner" that speaks to the General Partner's liability for self-dealing transactions.

---

[81] Dkt. No. 60 at 42.

[82] *Id.*; *also Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) ("Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."); *also Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, No. 6546-VCL, 2014 Del. Ch. LEXIS 205, at *28 (Ch. 2014) ("As the party who controlled the General Partner, [defendant] owed a fiduciary duty of loyalty which required that he act in the best interests of the Partnership for the ultimate benefit of its limited partners."). Defendants' desired interpretation of *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 101 (Del. 2013) has it exactly backwards. There, the parties contracted for a standard of "good faith" and the agreement defined that term as "belief that the determination or other action is in the best interest of the Partnership." *Id.* But Defendants' wrongly construe the holding to be that when the parties contract for the General Partner to "at all times act in the best interest of the Partnership" that means "good faith at the exclusion of other duties." The Court disagrees.

[83] *See Oliver v. Bos. Univ.*, No. 16570-NC, 2006 Del. Ch. LEXIS 75, at *77 (Ch. 2006).

[84] *Cole v. Kershaw*, No. Civ.A.13904, 2000 Del. Ch. LEXIS 117, at *25 (Aug. 15, 2000).

[85] *See id.*

[86] *Weinberger v. Uop*, 457 A.2d 701, 711 (Del. 1983).

[87] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011) (citing *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997)).

[88] *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997).

Exculpation provisions are allowed under DRULPA § 17-1101(f)[89] and differ from provisions under subsection (d) in that they limit *liability* as opposed to paring back the *duties themselves*.[90] The McAllen Partnership Agreement says that "the General Partner will not be liable for any loss to the Partnership or the Limited Partners by reason of any act or failure to act unless the General Partner was guilty of willful misconduct or gross negligence."[91]

The Court has already held that "far from eliminating fiduciary duties, Section 16.1's language is consistent with fiduciary duties."[92] In *Feeley v. NHAOCG*, Vice Chancellor Laster considered an LLC's exculpatory provision that was materially similar to those in the Partnership Agreements here.[93] He held that the provision did "not disclaim or eliminate fiduciary duties" but "rather (i) assume[d] that default fiduciary duties exist[ed], (ii) limit[ed] only potential availability of monetary remedy, not the potential for injunctive or other equitable relief, and (iii) restore[d] the availability of damages as a remedy for, among other things, gross negligence and willful misconduct."[94]

A few things are clear. First, consistent with *Feeley*, this Court has already held that section 16.1 does not eliminate fiduciary duties.[95] Second, *Feeley* clearly holds that exculpatory provisions limit monetary liability but do not touch equitable remedies such as restitution and injunction.[96] Under Delaware law, a plaintiff alleging a breach of fiduciary duty or diversion of a corporate

---

[89] 6 Del. C. § 17-1101(f) ("A partnership agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner or other person to a limited partnership or to another partner or to an other person that is a party to or is otherwise bound by a partnership agreement; provided, that a partnership agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.").

[90] *Infra* note 94.

[91] McAllen Partnership Agreement section 16.1, Plaintiffs' Ex. 16.

[92] Dkt. No. 60 at 37.

[93] *Contra* Defendant's argument that *Feeley* applies only to LLCs. Dkt. No. 93 at 22, ¶ 37. The statutory provisions interpreted in that case are identical those in DRULPA. *C.f.* 18-1101(c) *and* 17-1101(c); *c.f.* 18-1101(e) *and* 17-1101(f). Furthermore, Defendants heavily rely on *Kelly v. Blum*, an LLC case interpreting Del. C. § 18-1101.

[94] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 665 (Del. Ch. 2012).

[95] Dkt. No. 60 at 37.

[96] *Feeley,* 62 A.3d at 664.

opportunity may seek disgorgement[97] or imposition of a constructive trust.[98] Even when an exculpatory provision precludes monetary liability, "injunctive relief, a decree of specific performance, rescission, the imposition of a constructive trust, and a myriad of other non-liability-based remedies remain in play."[99] In their complaint, Plaintiffs request the relevant equitable relief including accounting for profits, disgorgement, and injunctive relief.[100] These are mutually exclusive[101] alternatives to damages-based recovery in which Plaintiffs do not seek recovery for harm from the breach of fiduciary duty or expectation on the contract;[102] they seek the Defendants' net profits from their wrongdoing.[103] Delaware courts use profit-based remedies when the counterfactual—what would Plaintiffs have without Defendants' misconduct?—is so speculative that it cannot provide an adequate remedy.[104] The Court **HOLDS** that on any claims where Plaintiffs elect equitable remedies in the alternative to damages or losses, section 16.1 does not limit that recovery.

But the Court must still speak to the operation of section 16.1 when Plaintiffs elect monetary damages. As to the burden of proof, the Court previously held that "[i]n general, exculpatory provisions are affirmative defenses that cannot provide a basis for dismissal."[105] At this stage of the litigation, must the General Partner prove that 16.1 exculpates its conduct, or must Plaintiffs prove that it does not? Delaware "[a]uthorities demonstrate persuasively that the General

---

[97] *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011) ("Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit.").

[98] *E.g., Thorpe v. CERBCO*, 611 A.2d 5 (Del. Ch. 1991).

[99] *Feeley*, 62 A.3d at 664.

[100] Dkt. No. 37 at 66, ¶¶ 164-165.

[101] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

[102] So this holding also has implications for Plaintiffs' breach of contract claims over exculpatory provisions of the RSA 18 and 19 Partnership Agreements. *Ifra* part III.B.1.b.iii.

[103] Restatement (Third) of Restitution and Unjust Enrichment § 51 (Am. Law Inst. 2011).

[104] *E.g. PharmAthene, Inc. v. SIGA Techs., Inc.*, Civil Action No. 2627-VCP, 2011 Del. Ch. LEXIS 189, at *12 (Ch. 2011).

[105] Dkt. No. 60 at 36 (citing *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 & n.161 (D. Del. 2008) (collecting cases).

Partner should bear this burden. In the analogous context of corporate law exculpation, the director defendants must prove that they fall within the exculpatory provision's protections."[106] Although the Delaware Supreme Court has not spoken to this issue as directly in the partnership context as in the corporation context,[107] there is no structural reason to believe there would be asymmetry. The Court's burden placement for exculpatory charter provisions under 8 Del. C. § 102(b)(7) should apply equally to exculpatory partnership agreement provisions under 6 Del. C. § 17-1101(f). Sure enough, where the parties shift the burden of proof contractually, the contractual provision applies.[108] But as to the McAllen Partnership Agreement's exculpation clause in 16.1, the Court finds no burden shifting provision.

Therefore, if the Court finds a breach of fiduciary duty under entire fairness, Defendants have the opportunity to prove that they are exculpated from monetary liability for it. To do so, they must prove that the offending conduct was not committed by "gross negligence or willful misconduct."

Since Plaintiffs challenge AT&T's intentional decisions with respect to self-dealing transactions, willful misconduct is at issue, not gross negligence. Willful misconduct sets a higher

---

[106] *Bandera Master Fund LP v. Boardwalk Pipeline, LP*, No. 2018-0372-JTL, 2021 Del. Ch. LEXIS 266, at *239 n.34 (Ch. 2021) (citing *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999)).

[107] *Emerald P'rs*, 726 A.2d 1215, 1223-1224 ("Defendants seeking exculpation under such a provision will normally bear the burden of establishing each of its elements. Here, the Court of Chancery incorrectly ruled that Emerald Partners was required to establish at trial that the individual defendants acted in bad faith or in breach of their duty of loyalty. To the contrary, the burden of demonstrating good faith, however slight it might be in given circumstances, is upon the party seeking the protection of the statute."). Three years before, the Delaware Chancery Court held the opposite—that language identical to the McAllen Partnership Agreement's section 16.1 placed the burden of proof on the plaintiff—in *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv.*, Civil Action No. 13389, 1996 Del. Ch. LEXIS 116, at *42 (Ch. 1996). In declining to follow *Ameritech*, the Court notes (1) that it was decided before the Delaware Supreme Court's seminal holding on burden of proof for exculpatory provisions in *Emerald P'rs* and (2) that the plaintiff in *Ameritech* did not allege willful misconduct but only gross mismanagement.

[108] *See Dieckman v. Regency GP LP*, No. 11130-CB, 2021 Del. Ch. LEXIS 28, at *40 (Ch. 2021) (interpreting a contractual provision stating, "challenging such approval, the Person bringing or prosecuting such proceeding shall have the burden of overcoming such presumption.").

bar than entire fairness review.[109] It involves "intentional wrongdoing, not mere negligence, gross negligence or recklessness."[110] In discerning the controller's subjective intent,[111] the Court may consider circumstantial evidence and "reasonably conceivable inferences."[112] Insofar as willful misconduct involves a showing of scienter,[113] it "requires proof that a [controller] acted inconsistent with his fiduciary duties and, most importantly, that the [controller] *knew* he was so acting.[114] "Willful misconduct is one standard for evaluating whether a fiduciary breached the duty of loyalty by acting in bad faith."[115]

Plaintiffs rightly identify *In re Walt Disney* as the seminal case on bad faith (though they do not always interpret it consistently). In that case, the Supreme Court of Delaware elucidated its taxonomy of duties and intentionality. It held intentional misconduct to be an example of bad faith,[116] and bad faith to be a "category of fiduciary conduct, which falls in between the first two categories of (1) conduct motivated by subjective bad intent and (2) conduct resulting from gross negligence."[117] "A failure to act in good faith may be shown, for instance, where the fiduciary *intentionally* acts with a purpose other than that of advancing the best interests of the corporation," or in this case, the Partnership.[118] The exculpation that Defendants seek is available where they

---

[109] *Contra* Dkt. No. 84 at 44, ¶ 64 (Plaintiffs conflate retention of fiduciary duties with retention of entire fairness review in arguing that section 16.1 has no effect.).

[110] *W.D.C. Holdings, LLC v. IPI Partners, LLC*, No. 2020-1026-JTL, 2022 Del. Ch. LEXIS 145, at *31 (Ch. 2022) (citing *Dieckman v. Regency GP LP*, 2021 Del. Ch. LEXIS 28, 2021 WL 537325, at *36 (Del. Ch. Feb. 15, 2021), aff'd, 264 A.3d 641 (Del. 2021)).

[111] *Id.*

[112] *Voigt v. Metcalf*, No. 2018-0828-JTL, 2020 Del. Ch. LEXIS 55, at *67 (Ch. 2020) (analyzing plaintiff's bad faith claim at the pleading stage).

[113] *Kelly v. Blum*, Civil Action No. 4516-VCP, 2010 Del. Ch. LEXIS 31, at *50 (Ch. 2010).

[114] *In re Massey Energy Co. Derivative & Class Action Litig.*, No. 5430-VCS, 2011 Del. Ch. LEXIS 83, at *83 (Ch. 2011) (interpreting *In re Caremark Int'l*, 698 A.2d 959 (Del. Ch. 1996)).

[115] *Feely*, 62 A.3d at 664; *also In re Cadira Grp. Holdings, LLC Litig.*, 2021 Del. Ch. LEXIS 151 at *26-27.

[116] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006); *accord Feely*, 62 A.3d at 664.

[117] *Id.* at 66.

[118] *See id.* at 67 (emphasis added).

can prove that they did not intentionally act with a purpose other than advancing the best interest of the McAllen Partnership.

Therefore, the Court will evaluate Plaintiffs' claims against the General Partner pursuant to the McAllen Partnership Agreement under entire fairness review. If Plaintiffs base their theory of recovery in equity (namely, injunctive relief and disgorgement of net profits), then section 16.1 does not apply and entire fairness is the end of the matter. But if they base their theory of recovery in monetary damages, then AT&T has the opportunity to prove that it is exculpated from damages for non-willful misconduct.

### b.  Breach of contract standard

Contractual modification can alter both the controller's standard of conduct—i.e., what constitutes a breach of the duty of loyalty—and it can alter the court's standard of review.[119] The RSA 18 and RSA 19 Partnership Agreements are similar to the McAllen Partnership Agreement in that section 8.1 establishes a background duty of loyalty by requiring the General Partner to act in the best interest of the Partnerships. But they differ from the McAllen Partnership Agreement by providing a safe harbor for conflicted transactions so long as "such transactions are comparable to, or not substantially less favorable than, similar arms'-length transactions between the General Partner or its Affiliates and unrelated third parties" and the transactions are not entered into with "gross negligence or willful misconduct."[120]

### i.  Scope of the safe harbor under 7.5

Unlike an exculpatory provision, a safe harbor provision *does* modify the underlying duties, not just liability on theories of monetary relief.[121] But before the Court can apply section

---

[119] *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 817 A.2d 160 (discussing contractual alteration of entire fairness duties of fair dealing and fair price).
[120] RSA 18 & 19 Partnership Agreements, Plaintiffs' Exs. 17-18 at 16.
[121] *See* Dkt. No. 60 at 42-44.

7.5 to the self-dealing transactions that Plaintiffs identify, it must determine whether it is applicable to each of those transactions.[122]

First Plaintiffs throw a Hail Mary, arguing that because they are not "Affiliates" per the contract definition section, section 7.5 does not apply to conflicts involving them.[123] But when section 7.5 refers to the General Partner's conflicting duties *to* its Affiliates, it undoubtedly means conflicting with duties it has to the Partnerships and, by extension, the Limited Partners.[124] The reference to duties between two Affiliates is included "without limitation."[125] Furthermore, Defendants correctly point out that it makes little sense to include a contractual provision that applies only to non-parties.[126]

Second, the organizational structure of section 7.5 allows for transactions between the Partnership and AT&T affiliates "*provided that* the terms and conditions of such transactions are comparable to, or not substantially less favorable than, similar arms'-length transactions [with] third parties."[127] Only then does it state that in those permissibly conflicted deals, disputes regarding conflicting duties will be resolved on a "gross negligence and willful misconduct" standard.[128] The phrase, "provided that," creates a conditional term.[129] If the terms and conditions of the deal are not comparable to those at arm's length, then safe harbor protection never gets off the ground. In that case, the "gross negligence and willful misconduct" standard is not invoked because that kind of asymmetric self-dealing is not permitted under section 7.5 in the first place.

---

[122] *Kahn v. Icahn*, Civil Action No. 15916, 1998 Del. Ch. LEXIS 223, at *9 (Ch. 1998).
[123] Dkt. No. 84 at 39-40.
[124] *See* Plaintiffs' Ex. 17 at 16.
[125] *Id.*
[126] Dkt. No. 93 at 27-29.
[127] RSA 18 & 19 Partnership Agreements, Plaintiffs' Exs. 17-18 (emphasis added).
[128] *Id.*
[129] BLACK'S LAW DICTIONARY, 1240, 7th ed. (1999).

Any alternative reading would render the contract's proviso about arm's-length terms and conditions mere surplusage. The parties could have contracted for "gross negligence and willful misconduct" to apply to all conflicted transactions, regardless of the terms. But that is not what the Partnership Agreements say. For conflicted transactions to be safe harbored, the transactions must first be "comparable to or not substantially less favorable than, similar arms'-length transactions."[130] If the Court determines that the terms do not meet the threshold to be considered arm's-length, that is the end of the 7.5 analysis.

Third, Plaintiffs point out that although section 7.5 is titled "Conflicts of Interest," it does not grant the General Partner rights as to *any* conflict of interest. It only grants:

> [T]he right to contract or otherwise deal with the Partnership for the sale or lease
> of real or personal property, the rendition of services and other purposes, and to
> receive payments and fees from the Partnership in connection therewith."[131]

Plaintiffs argue that although the data cost sharing process and spectrum Service Agreements are cases where AT&T receives payments and fees from the Partnerships, the Cricket arrangement and other revenue streams do not fit so neatly within the language of 7.5. Defendants respond that the Cricket arrangement and other revenue streams do fit because of 7.5's "and other purposes" provision.[132] To determine the meaning of that phrase, the Court applies the canon of *ejusdem generis*: "Where general words follow an enumeration of two or more things, they apply only to the persons or things of the same general kind or class specifically mentioned."[133]

The drafting of section 7.5 provides an interesting test case for *ejusdem generis*. Were "and other purposes" the last item in the list, the Court's task would be to determine whether the Cricket

---

[130] RSA 18 & 19 Partnership Agreements, Plaintiffs' Exs. 17-18 at 16.
[131] *Id.*
[132] Dkt. No. 93 at 27-29.
[133] *See* ANTONIN SCALIA AND BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS at 199 (2012).

arrangement and allocation of other revenue streams are in the same class as the specifically enumerated items. But the general phrase is not at the end; it is in the middle. Even though the canon typically requires two specifics to form a class,[134] the drafter's choice to place "and other purposes" right after "the rendition of services" indicates a narrowing of the phrase's operation, not a broadening of it. The best interpretation of section 7.5 is that "other purposes" must be tethered to the rendition of services.

But even if "and other purposes" were the last item in the list, the Cricket arrangement and allocation of other revenue streams still would not be within the same class. These decisions—to retain for AT&T what could have been Partnership opportunities—do not relate to the sale or lease of property, do not involve the rendition of services, and do not require the Partnership to pay AT&T. Even though usurpation of partnership opportunities are conflicts of interest, they are not the types of conflicts covered by section 7.5.

Therefore, the Court **HOLDS** that section 7.5 of the RSA 18 and RSA 19 Partnership Agreements applies only to AT&T's data cost sharing process and spectrum Service Agreement. The duty of loyalty established in section 8.1 applies[135] to the Cricket arrangement and allocation of other revenue streams, which are effectively diversions of partnership opportunities. Furthermore, section 7.5's "willful misconduct and gross negligence" standard applies only once the Court determines that the terms were at arm's length.

---

[134] *Id.* at 206.

[135] Section 8.1 is a full-throated defense of the duty of loyalty. Plaintiffs' Exs. 16 at 24, 17 at 17, 18 at 16. *See Pers. Touch Holding Corp. v. Glaubach*, No. 11199-CB, 2019 Del. Ch. LEXIS 66, at *76 (Ch. 2019) (citing *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993)) ("The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over a director's self-interest.") (cleaned up). In that case, "[t]he requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. Uop*, 457 A.2d 701, 710 (Del. 1983).

        ii.   Judicial review of self-dealing transactions under section 7.5

In its previous order, the Court stated that the language of section 7.5, where applicable, "does displace fiduciary duties" in favor of contractual ones.[136] Thus, the Court's role is limited to determining whether Defendants acted in compliance with their duties as defined by contract. But the Court did not decide how it would evaluate Plaintiffs' breach of contract claims.[137] It is possible for a contractual provision to restate full-fledged fiduciary duties such that contractual review is the functional equivalent of entire fairness review.[138] But section 7.5 is not that kind of provision.

Safe harbor provisions do not have a uniform rule about who bears the burden of proof to show their applicability. It depends on the language. For example, in *Auriga*, the Delaware Supreme Court held that an LLC Agreement's safe harbor restated entire fairness review (with the burden on the defendant) where it stated, "[n]either the Manager nor any other Member shall be entitled to cause the Company to enter into" self-dealing transactions without a fair price and fair process.[139] Note the negative "neither." In *Zimmerman* by contrast, the plaintiff had the burden where the safe harbor gave "members, directors, or officers the affirmative right to engage in transactions with the Company, provided that such transaction is comparable to a third-party transaction [and was] distinguishable from the *Auriga* provision."[140]

Section 7.5 of RSA 18 and 19 is like the safe harbor in *Zimmerman*. It states that the "General Partner and its Affiliates shall have the right to contract or otherwise deal with the Partnership" given certain conditions. That positive language, unlike the negative language of *Auriga*, places the burden on Plaintiffs to prove by a preponderance of the evidence that the

---

[136] Dkt. No. 60 at 42.
[137] *Id.* at 31-32.
[138] *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160 (Del. 2002).
[139] *Gatz Props., Ltd. Liab. Co. v. Auriga Capital Corp.*, 59 A.3d 1206, 1212 (Del. 2012).
[140] *Zimmerman v. Crothall*, 62 A.3d 676, 706 (Del. Ch. 2013).

challenged transactions were not comparable to similar arm's-length transactions with unrelated third parties. That is Step 1. If Plaintiffs meet their burden and Defendant cannot successfully rebut, then section 7.5 does not protect the General Partner as to that conflicted transaction. But if the Court determines that the terms *were* at arm's length, then Plaintiffs move to Step 2 and have the burden to prove that the conflicted transaction constitutes gross negligence or willful misconduct.

The standard at Step 2—gross negligence or willful misconduct—is a familiar one to this case. Above, the Court interprets challenges to Defendants' loyalty using that same language in the context of section 16.1 of the McAllen Partnership Agreement. There, willful misconduct is a type of bad faith in which, *inter alia*, the General Partner intentionally acts in a way that is not in the best interest of the Partnership. The Court applies the same analysis to section 7.5 except that unlike under section 16.1 of the McAllen Partnership Agreement, the burden now lies with the Plaintiffs.

Defendants attempt to put fiduciary duties in the rearview mirror by focusing on the Court's prior quotation of a case out of bankruptcy court about contractual selection of "merely a duty of good faith."[141] Defendants are right that section 7.5 does not support entire fairness review. But good faith is still a high bar. Loyalty to the Limited Partners is still implicated in 7.5 analysis because, under Delaware law, "[w]illful misconduct is one standard for evaluating whether a fiduciary breached the duty of loyalty by acting in bad faith."[142] The General Partner might flunk section 7.5 where the Court finds that it intentionally acted with a purpose other than that of

---

[141] Dkt. No. 93 at 23-24, ¶¶ 41-42 (citing *In re Kilroy*, No. 05-90083-HD-7, 2008 WL 780692, at *6 (Bankr. S.D. Tex. Mar. 24, 2008)).

[142] *Feeley v. NHAOCG, Ltd. Liab. Co.*, 62 A.3d 649, 664 (Del. Ch. 2012) (citing *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006)); *see also In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del. 2006) (holding bad faith to be a "category of fiduciary conduct, which falls in between the first two categories of (1) conduct motivated by subjective bad intent and (2) conduct resulting from gross negligence" and that bad faith could be found "where the fiduciary acts with a purpose other than that of advancing the best interests of the corporation.").

advancing the best interests of the Partnerships or where its actions demonstrate a conscious disregard for its duties.[143]

Therefore, where section 7.5 applies, Plaintiffs bear the burden of proving either that the conflicted transaction's terms were not at arm's length or that it was entered into with gross negligence or willful misconduct. If Plaintiffs fail, then the conflicted transaction is within the General Partner's contractual rights. If Plaintiffs succeed, however, then the Court applies entire fairness review under section 8.1.

iii. Exculpation under section 16.1

The Court's above analysis of section 16.1 as it applies to the McAllen Partnership Agreement is also applicable to the RSA 18 and 19 Partnership Agreements—including the inapplicability of section 16.1 to equitable relief—with one catch. As above, once Plaintiffs have met their initial burden or Defendants have failed to meet theirs under entire fairness review, Defendants have the opportunity to prove that they are exculpated from monetary liability. But under the RSA 18 and 19 versions of section 16.1, conduct is exculpated unless the Court "determines by clear and convincing evidence that the General Partner was guilty of willful misconduct or gross negligence."[144] Thus, for the General Partner's breach to be exculpated, it must only show that there is not clear and convincing evidence of its bad faith.

---

[143] *See Stone v. Ritter,* 911 A.2d 362, 369 (Del. 2006) (citing *Walt Disney*, 906 A.2d at 67).
[144] RSA 18 & 19 Partnership Agreements, Plaintiffs' Exs. 17 at 30, 18 at 29.

### 2. Application

To summarize the Court's holding on the applicable standards, the Court provides the following:

|  | Default standard | Modification/safe harbor | Exculpation |
|---|---|---|---|
| **McAllen Partnership** (breach of fiduciary duty) | Section 8.1 (entire fairness) | No | Yes—section 16.1 (Defendants' burden to prove absence of gross negligence and willful misconduct) |
| **RSA 18 & 19** (breach of contract) | Section 8.1 (entire fairness) | Yes[145]—section 7.5 (if arm's length, then Plaintiffs have burden to prove gross negligence or willful misconduct by preponderance) | Yes—section 16.1 (Defendants' burden to prove there is no clear and convincing evidence of gross negligence or willful misconduct) |

The Court now applies these standards to the specific self-dealing transactions for which Plaintiffs have moved for summary judgement.

### a.   Data cost sharing methodology

AT&T's 2010 decision to compensate the Partnerships for intracompany data roaming at cost implicates the duty of loyalty. For voice roaming, the Partnership was compensated at a roaming rate.[146] Under the data cost sharing methodology rolled out in 2010, in contrast, the Partnership was compensated at cost, as has already been described above.[147]

---

[145] Section 7.5 of the RSA 18 and RSA 19 Partnership Agreements applies to the data cost sharing methodology and spectrum Services Agreements but not to the Cricket arrangement and other revenue streams which are properly categorized as diversions of Partnership opportunities.
[146] Ernst & Young Internal Memo to AT&T, Plaintiffs' Ex. 96 at 1.
[147] *Supra* part III.A.

Plaintiffs intuitively argue that paying cost for data roaming, instead of a third party or a reseller rate, was not entirely fair and was not in the best interest of the Partnerships.[148] Under Delaware law, "[t]he concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals . . . were obtained. The latter aspect of fairness relates to the economic and financial considerations of the [challenged action]."[149] The two aspects, however, are not bifurcated,[150] such that an unfair process can "infect" the price and vice versa.[151]

Much of the summary judgment evidence considered in this Court's denial of Defendants' time bar defense[152] applies to entire fairness review as well. When AT&T paid cost for data roaming, it operated outside the realm of the parties' past dealing or industry standards, and it did so without adequate disclosure. The Partnerships rightly expected to be paid some arm's-length or otherwise fair rate for providing data services to non-homed AT&T customers roaming on their networks. Instead, they were strictly reimbursed their costs.

Defendants argue that cost-based compensation had a positive net impact on the Partnerships' balance sheets,[153] but this argument ignores the issue that the Partnerships serving as net providers would have benefitted from a higher rate (holding traffic constant). Similarly, the defense that AT&T had the Partnership's *long term* best interest in mind when it kept costs low to rapidly expand the data network strains credulity since the choice to keep data costs low does not necessitate paying the Partnerships no revenue at all. Defendants' contention that data roaming

---

[148] Dkt. No. 84 at 55, ¶ 86.
[149] *Uop*, 457 A.2d at 711.
[150] *Id.*
[151] *Reis*, 28 A.3d at 467 (citing *Kahn,* 694 A.2d at 432).
[152] *Supra* part III.A.
[153] Dkt. No. 93 at 46, ¶ 69.

rates were artificially inflated in 2010[154] is also weak since artificially high market rates to not preclude AT&T from setting *some* rate above cost.[155] For example, in 2009 Verizon adopted an intracompany roaming compensation model to pay its partnerships for data traffic.[156] AT&T's data cost sharing methodology fails the fair price prong and does not receive safe harbor protection under the RSA Partnership Agreements because there is no arm's length price. [157] The arrangement also fails the fair process aspect because the General Partner failed to adequately disclose that it is the exclusive avenue by which the Partnerships are compensated for providing data services to non-homed AT&T customers,[158] and there was no negotiation since AT&T unilaterally set the cost-based rate behind closed doors every six months (in contrast to bilateral contract negotiations with counterparty carriers and resellers).[159]

As to the McAllen Partnership, the General Partner has failed entire fairness review, and the Court **GRANTS** Plaintiffs' motion for summary judgment. The data cost sharing methodology **BREACHES** the General Partner's **FIDUCIARY DUTY**. As to the RSA 18 and RSA 19 Agreements, Plaintiffs have met their burden of proving that the terms of the data cost sharing methodology were not at arm's-length, so the General Partner also fails section 7.5, turning the analysis to section 8.1 under which the data cost sharing methodology also **BREACHES** the RSA 18 and 19 Partnership Agreements.

The Court then moves to consideration of willful misconduct, the existence of which would preclude exculpation and allow Plaintiffs to recover on a theory of monetary damages in addition to equitable relief. It is Defendants' initial burden to prove that there was no gross negligence or

---

[154] Deposition of Gregory Hall, Plaintiffs' Ex. 5 at 80.
[155] The General Partner is granted discretion in making decisions about what constitutes market (*e.g.*, Partnership Agreements section 8.2), but paying cost was not even an attempt to pay market.
[156] Ernst & Young Internal Memo to AT&T, Plaintiffs' Ex. 96 at 3.
[157] *Supra* part III.B.1.b.i.
[158] *Supra* part III.A.
[159] Deposition of Eric Wages, Plaintiffs' Ex. 8 at 224.

willful misconduct. The Court grants summary judgment to the Plaintiffs on this point only if they are able to rebut Defendants' initial showing and prove that there is no genuine dispute that the General Partner *knew* it was acting inconsistent with its legal duties.[160]

Defendants' corporate representative for Cricket, Jennifer Van Buskirk, admitted that it would be unreasonable to expect a third party like Verizon to accept cost compensation for data roaming.[161] AT&T knew that cost is lower than a wholesale rate.[162] Gregory Hall and the General Partner's representative testified that data cost sharing was viewed as a fair way to compensate the Partnerships for their use of the nationwide data network.[163] Whether a reciprocal rate lower than wholesale could conceivably be in the Partnerships' interest depends on whether the Partnership in question is running a positive or negative balance of data traffic at a given time. EY's contemporaneous memo on the adoption of data cost sharing explained that "traffic patterns on average, are equal materially on a reciprocal basis. Accordingly, the net impact of [data cost sharing] is generally not significant to the Partnership's financial statements."[164] In hindsight, EY was right that the Partnerships' traffic balance is a mixed bag. The parties here seem to agree that the McAllen Partnership is typically a net user; its customers roam on the rest of AT&T's network and on other Partnerships more than non-homed AT&T customers roam in the McAllen Partnership's service area.[165] This makes cost a beneficial price for the Partnership during those net using distribution cycles.

But these justifications focus "best interest" on the wrong level of analysis. AT&T has an obligation to *each* Partnership individually, not an obligation to a Frankenstein's monster of all its

---

[160] *See in re Massey Energy Co. Derivative & Class Action Litig.*, No. 5430-VCS, 2011 Del. Ch. LEXIS 83, at *83 (Ch. 2011) (interpreting *In re Caremark Int'l*, 698 A.2d 959 (Del. Ch. 1996)).
[161] Deposition of Jennifer Van Buskirk, Plaintiffs' Ex. 4 at 120.
[162] Plaintiffs' Ex. 96 at 4.
[163] Plaintiffs' Ex. 1 at 55; Plaintiffs' Ex. 5 at 55.
[164] Ernst & Young Internal Memo to AT&T, Plaintiffs' Ex. 96 at 5.
[165] *See* Dkt. No. 84 at 55, ¶ 86.

nationwide partnerships collectively. Each Partnership here has its own Agreement with AT&T in which AT&T promises to do what is in *that* Partnership's best interest. But the summary judgment evidence shows that AT&T did not take an individualized approach to setting data compensation rates: there is no per-partnership market analysis, no negotiation with limited partners, no partnership meetings to discuss possibilities. All that AT&T has to stand on is EY's conclusions from an audit of one partnership.[166]

The resulting one-size-fits-none approach is willful misconduct under Delaware law. The adoption of data cost sharing was inconsistent with the General Partner's obligation to do what is in the best interest of Partnerships that are net data providers, and AT&T knew that some partnerships would be net providers. Perhaps a partnership like McAllen would have been comfortable with a low or cost rate anticipating that its balance of traffic might be negative or neutral. But a partnership like RSA 18 or 19 would never have agreed to that because they knew they would be net providers of data services for roaming AT&T subscribers. There is clear and convincing evidence that AT&T's decision to mulch all these interests together was intentional, and exculpation under section 16.1 is **DENIED**.

b.   Cricket arrangement

Above, the Court held that the Cricket arrangement does not fall within the scope of section 7.5 of the RSA 18 and RSA 19 Agreements. Historically, GoPhone was the prepaid AT&T product and GoPhone customers within the Partnership service area were allocated to the Partnerships, becoming their customers too. Project Zig was something new.[167] Under this plan, a new prepaid product line, Aio, was combined with the newly acquired Cricket to form New Cricket and was

---

[166] Ernst & Young Internal Memo to AT&T, Plaintiffs' Ex. 96 at 5.
[167] Plaintiffs' Ex. 35.

operated independently from the Partnerships.[168] Cricket's prepaid customers might be homed in the Partnership area without becoming Partnership customers. Cricket was wildly popular in AT&T's south Texas region, and Cricket traffic on the Partnerships' networks required them to deploy additional cell towers.[169]

Rather than allocating customers, the Cricket compensation arrangement functions in the following way:[170]

|  | Voice activity in Partnership area | Data activity in Partnership area |
|---|---|---|
| Cricket customer homed in Partnership area | Weighted average reseller rate | Weighted average reseller rate |
| Cricket customer not homed in Partnership area | Weighted average roaming rate | Cost |

Because AT&T retained Cricket customers, there is no netting out; AT&T has Cricket customers who roam on Partnership networks, but the Partnerships do not have Cricket customers to roam on non-Partnership networks. The Partnerships are *per se* net providers.

AT&T argues that it was in the best interest of the Partnerships not to have Cricket customers allocated to them. Deposition testimony from AT&T employees maintain the party line: a Cricket customer is even better for the Partnerships than a GoPhone customer.[171] In laymen's terms, the rationale was that compensation (as opposed to contribution) saves the Partnerships acquisition costs such as sales, marketing, promotions, and commissions.[172] The technical explanation is produced as a "model,"[173] provided to the Limited Partners at a partnership meeting in July of 2015.[174] Plaintiffs' challenges to the rates themselves will be discussed below, but the

---

[168] Plaintiffs' Ex. 83 at 59 (specifically discussing how Zig would compete with the Partnerships).
[169] Plaintiffs' Ex. 130; Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 246-249.
[170] Taken from Defendants' motion for summary judgement, Dkt. No. 80 at 20, ¶ 22.
[171] Deposition of Karen DeShazor, Defendants' Ex. 25 at 46; Deposition of Eric Wages, Plaintiffs' Ex. 8 at 194-210; Deposition of Jennifer Van Buskirk, Plaintiffs' Ex. 4 at 153-195.
[172] Deposition of Eric Wages, Plaintiffs' Ex. 8 at 198.
[173] Defendant's Ex. 36.
[174] Deposition of Eric Wages, Plaintiffs' Ex. 8 at 194.

model would help explain whether AT&T even considered the right metrics in adopting the Cricket compensation methodology.

The model, in the format it has been produced to the Court, is not very useful summary judgment evidence because the Court cannot see how the Microsoft Excel cells are linked via formulas in the provided PDF format.[175] However, the summary judgment evidence indicates there are serious problems with the model at it relates to Plaintiffs. While the model factors in risk of Cricket's cannibalization into existing AT&T post-paid and pre-paid markets, it does so on a nationwide basis.[176] Cricket's corporate representative, Jennifer Van Buskirk, expressly states that the model does not consider localized risk of cannibalization for the south Texas market.[177] That omission is important because south Texas is Cricket's largest customer base.[178]

The Court is also highly skeptical that the need to operate Cricket's customer-facing business separate from AT&T's prepaid business, in contrast to GoPhone,[179] necessitated the back-end accounting models that Plaintiffs challenge here. Marketing Cricket to the public as an independent brand is one thing. But Defendants have not sufficiently explained nor evinced why this requires cutting the Partnerships out of the customer allocation methodology that they were accustomed to.[180] In fact, Gregory Hall emphasizes that "the customer in their data retail plan doesn't have anything to do with the data cost application. Those are completely different terms."[181]

---

[175] Defendant's Ex. 36.
[176] Deposition of Jennifer Van Buskirk, Plaintiffs' Ex. 4 at 166-167.
[177] *Id.*
[178] *See* Plaintiffs' Ex. 85.
[179] The justification for the Cricket arrangement given by Jennifer Van Buskirk, Plaintiffs' Ex. 4 at 154-155.
[180] When Cingular and AT&T merged in 2004, AT&T customers to contributed to the Partnerships. Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 107.
[181] Deposition of Gregory Hall, Plaintiffs' Ex. 5 at 61-62.

Plaintiffs also challenge the rates paid to compensate them for Cricket customers' use of their networks, and the Court agrees that the arrangement provided in the chart above cannot withstand entire fairness review. Put simply, the rate structures were not negotiated, and they are out of parity with the economic effect of Cricket customers' use of the Partnership networks.

The Partnerships are compensated for Cricket activity by subscribers homed in the Partnership service area at a weighted average reseller rate.[182] But homed Cricket customers do not just use the Partnerships' surplus network capacity, they use the network most of the time. They represent a significant portion of the Partnerships' stable traffic without being Partnership customers, and AT&T—not the Partnerships—ultimately determines how much Cricket traffic ends up on the Partnership network. Thus, homed Cricket customers are dissimilar to resellers' customers onto whom the Partnerships offload their surplus capacity. They are more akin to the Partnerships' own GoPhone customers, to resellers without any volume caps, or even to competitors' consistently roaming customers because they increase the base level of traffic the Partnerships must serve. Only rates that account for these facts could be considered entirely fair. In keeping with Delaware law's admonition that fair price and fair process are not bifurcated tests,[183] it is difficult to know how much network traffic the Partnerships would have seen as surplus since they were never able to negotiate rates or terms with Cricket or AT&T.

Similarly, cost compensation for carrying non-homed Cricket customers' data traffic[184] is not a fair price. The Court has already discussed why, when AT&T has an obligation to act in the Partnerships' best interest, compensating at cost is *prima facie* dubious. It is presently unclear to the Court whether a fair price for non-homed Cricket data traffic would have been a reseller rate

---

[182] Plaintiffs' Ex. 86.
[183] *Uop*, 457 A.2d at 711.
[184] Plaintiffs' Ex. 86.

(i.e., the traffic is filling up surplus network capacity) or roaming (i.e., it is creating inconsistent demand that justifies higher overhead). In either case, cost is not entirely fair.

AT&T argues that the Court should ignore rates and focus on overall benefit: that Cricket paid "the Partnerships more than twice the amount AT&T itself received in revenue from Cricket subscribers homed in Partnership areas."[185] But that figure is not worth touting since Cricket customers homed in the Partnership area would be expected to generate more costs for the Partnership than for AT&T affiliates. More generally though, AT&T's duties to Cricket are not a function of sheer magnitude of revenue. Where AT&T deprives the Partnerships from a profitable opportunity—paying a reseller rate for activity that is truly roaming, or paying cost for activity that is more like that generated by a wholesaler—the Partnerships' good bill of financial health is hardly evidence that AT&T complied with its legal duty to pay a fair price.

The Cricket arrangement also suffers from severe process deficiencies (some of which have already been discussed) including lack of notice.[186] Unlike some other arrangements that the General Partner executed with AT&T affiliates on behalf of the Partnerships, the Cricket arrangement had no corresponding contract.[187] Plaintiffs allege that failure to memorialize the Cricket arrangement in a written contract is a straightforward breach of Section 7.1(a) of the Partnership Agreements.[188] But that provision does not require a written contract, only that the conflicted transaction "shall be documented and shall become part of the records of the Partnership."[189] The express waiver of written contracts for management and operation in section

---

[185] Dkt. No. 93 at 46, ¶ 76.
[186] *See Cole v. Kershaw*, No. CIV. A. 13904, 2000 WL 1206672, at *8 (Del. Ch. Aug. 15, 2000) (identifying advance notice with fair process).
[187] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 212-213.
[188] Dkt. No. 84 at 42, ¶¶ 60-62.
[189] Partnership Agreements, Plaintiffs' Exs. 16 at 20, 17 at 13, 18 at 13. Defendant's motion deceptively stops quoting at the word "documented" since the way the rates were documented were strictly internal to AT&T. The Court admonishes Defense counsel to be mindful of the line between spirited advocacy on one side and lack of candor to the tribunal on the other.

7.5 tells us what 7.1(a) does *not* include, but it does not implicitly alter 7.1(a) to require a higher disclosure standard than does the plain language of the provision. Therefore, while Defendants are wrong that the Cricket arrangement is merely a matter of management and operation pursuant to sections 4.1 and 4.2 (and therefore excepted under section 7.5), simple documentation and recording is sufficient under 7.1(a).

So did the General Partner properly document and record the Cricket arrangement in the Partnerships' records? The Court finds that the answer is a resounding "No." The best that AT&T provides the Court is that in its tail-between-the-legs letter to VTX when it backed off its capital call in early 2015, it stated that it had adopted a wholesale compensation rate related to Cricket.[190] That tells VTX (but not the other Partnerships' Limited Partners) that Cricket customers are not being allocated, but it does not apprise them of the hot button issues like payment of cost for data roaming.

Once initiated, the Cricket compensation rates were adjusted (always downward) unilaterally by AT&T every six months.[191] Ms. Deaver, as the Partnerships' "advocate" within AT&T, pushed to provide *some* formal communication stream to the Limited Partners about these rate adjustments, but was shot down.[192] In fact, one of the few information streams that the Limited Partners received—quarterly subscriber reports—was severely misleading on the Cricket issue. From the Cricket acquisition in 2014 until May 26, 2016, subscriber ports[193] from AT&T's prepaid service to Cricket were booked as "migrations" instead of "deactivations."[194] For AT&T these were migrations because a Cricket customer is an AT&T customer. But for the Partnerships, these

---

[190] *See e.g.,* Plaintiffs' Ex. 35.
[191] Plaintiffs' Ex. 86.
[192] Plaintiffs' Ex. 104.
[193] When a customer moves from one carrier to another while keeping the same phone number.
[194] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 160-165.

were actually deactivations because Cricket customers are not customers of the Partnerships. This accounting "error" threw the Limited Partners off the scent of the true nature of their relationship to Cricket.

Cricket could have been an opportunity for the Partnerships to generate fair profit from the prepaid use of their networks. Instead, AT&T caused the Partnerships to provide data services to non-homed Cricket customers at cost and voice to "homed" Cricket customers at a reseller rate. But Plaintiffs argue that wasn't good enough for AT&T. Because non-homed voice roaming was compensated at a roaming rate while data roaming was compensated at cost, AT&T discussed using VoLTE (voice over LTE) to cut costs to the Partnerships for traditional voice roaming.[195] Plaintiffs also allege that the methodology for determining the reseller rate was jury rigged by AT&T to achieve the lowest result. AT&T started out excluding Tracfone,[196] turned to a "blended rate" including Tracfone,[197] and later discussed a "Tracfone only" rate.[198] According to Bradley Gifford, Director of Accounting at AT&T, that methodology was pushed by Cricket, which felt that it should be getting the same volume discount that Tracfone was getting.[199] In July 2015, he pushed for adoption of Tracfone only rates even though "[t]he weighted average rate for all resellers results in higher revenues (rate is higher) than a Tracfone only rate."[200] Though not ultimately adopted, the methodology was still being floated in October 2016 in negotiations between the General Partner and Cricket involving "attorneys representing both parties" . . . *both*

---

[195] Plaintiffs' Ex. 91.
[196] Plaintiffs' Ex. 88.
[197] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 138.
[198] Plaintiffs' Ex. 89.
[199] *Id.*
[200] *Id.*; *see also* Plaintiffs' Ex. 104 (Bradley Gifford approving the weighted average reseller rate proved that they "can adjust the Scenario #1 in the event that we switch to TF.").

being AT&T Mobility and Cricket.[201] All this evinces that AT&T was at best disinterested in (and at worst antagonistic to) the Limited Partners' financial interests in the Cricket arrangement.

The Court, therefore, can decide the instant motions without wading into the murky waters surrounding the question of how reflective the progressive decreases in rates paid to the Partnerships were of market rates. The Court finds that the Cricket compensation structure was not fairly priced, and it finds that Defendants have not shown that there is a genuine dispute as to any material fact on this point. The process AT&T used to decide to retain Cricket customers did not consider factors relevant to its obligations to Plaintiffs, and AT&T failed to adequately disclose the compensation structure to the Partnerships. Therefore, the Court **GRANTS** Plaintiffs' motion for summary judgment and finds that, as to the McAllen Partnership Agreement, the General Partner **BREACHED ITS FIDUCIARY DUTY** and as to the RSA 18 and RSA 19 Partnership Agreements, the General Partner **BREACHED SECTION 8.1.**[202] The General Partner also **BREACHED SECTION 7.1** by failing to include the Cricket arrangement in the Partnership records.

The Court then moves to consideration of willful misconduct. Here, AT&T, through its leadership,[203] has spoken out of one side of its mouth to say that its operation of Cricket is "in essence competing against [the Partnerships] which is not in compliance with the partnership agreements. To compensate them for this, [AT&T treats] them as a reseller and these rates were agreed upon."[204] But out of the other side of its mouth, it pays cost (not a reseller rate) for data and hides rates from the Limited Partners, adjusts the rates behind closed doors (or doors that are only

---

[201] Plaintiffs' Ex. 112.

[202] Recall that section RSA 18 and 19, section 7.5 does not apply to the Cricket arrangement. *Supra* Part III.B.1.b.ii.

[203] *B.A.S.S. Gp., LLC v. Coastal Supply Co.*, 2009 Del. Ch. LEXIS 166, 2009 WL 1743730, at *7 n.72 (Del. Ch. June 19, 2009) ("Delaware courts consistently have imputed to a corporation the knowledge of an officer or director of the corporation when acting on its behalf.").

[204] Words of Karen DeShazor, Mobility/Partnership Accounting, Plaintiffs' Ex. 110.

open to Cricket, not to the Limited Partners). When dissenting AT&T employees question the propriety of the arrangement, it responds—and the Court quotes an entire email—"hush".[205] In these circumstances, it is clear to the Court that the parties' Agreements provide no exculpation for the General Partner's conduct with respect to Cricket. Defendant's desired exculpation is **DENIED**.

c.   <u>Spectrum Services Agreement</u>

The Plaintiff Partnerships arose out of allocation of licenses by the FCC. The Partnership Agreements anticipated that further licenses will be purchased and used by the Partnership, and it expressly provides that "[t]he General Partner shall, on behalf of the Partnership . . . cause to be transferred to the Partnership's name all licenses, permits or other regulatory approvals necessary to provide Cellular Service."[206] The definition of "Cellular Service" differs slightly (but importantly) between the Agreements. The first agreement, the McAllen Partnership Agreement, defines Cellular Service as service authorized under Part 22 of the FCC regulations *and* pursuant to the Agreement.[207] The Delaware Supreme Court has held that this kind of language should be interpreted to strictly mean what is says: spectrum bands not covered by Part 22 are not "Cellular Services" and section 4.4 doesn't apply to them.[208] Therefore, Defendant's motion for summary judgment is **GRANTED** as to Plaintiffs' claim that failure to allocate non-Part 22 spectrum licenses to the McAllen Partnership breached section 4.4. Conversely, failure to allocate Part 22

---

[205] Words of Eric Wages, *id.*
[206] McAllen Partnership Agreement, Plaintiffs' Ex. 16 at 13.
[207] *Id.* at 7-8; *see* APPENDIX A.
[208] *Cincinnati SMSA Limited Partnership v. Cincinnati Bell Cellular Systems Company*, 708 A2d 989, 993 (Del. 1998) ("In this case, the plaintiff articulates a policy argument, which is cogent at first blush, in support of implying an additional noncompete obligation with respect to PCS. The Limited Partnership sets forth two circumstances underlying its case: (1) the development and licensing of PCS was unforeseen at the time the parties entered into the Agreement; and (2) from a subscriber's perspective, PCS and 'Cellular Service' are indistinguishable . . . Its meaning is confined to that service authorized by a discrete FCC regulation without room to include developing systems.").

A-block spectrum licenses, callsigns KNKR228 and KNKR236,[209] does violate section 4.4 of the McAllen Partnership Agreement and may constitute a breach of contract, subject to the analysis below.

In contrast, the younger cousins RSA 18 and 19 define Cellular Service as service authorized under Part 22 of the FCC regulations "as amended from time to time, as promulgated under the Cellular Radio Decisions, and/or provided pursuant to the terms of this Agreement."[210] That language is much more expansive. The parties have certainly treated spectrum bands aside from those included in the original license as being pursuant to the Partnership Agreements. Therefore, *Cincinnati* does not apply to the RSA 18 and RSA 19 Agreements, and section 4.4 does impose obligations for the spectrum licenses in question here such that failure to allocate could constitute a breach.

Defendants argue that section 4.3 permits the General Partner to retain assets "required to provide for Cellular Service," which includes licenses.[211] Where there is a conflict between 4.3, a general provision about assets, and 4.4, a specific provision about licenses, the latter prevails in keeping with the canon of *generalia specialibus non derogant*.[212] Read together, sections 4.3 and 4.4 say that ownership of the assets required to provide Cellular Service is up to the General Partner's discretion, except that licenses must be owned by the Partnership.

Within the scope defined above, the General Partner does have a contractual obligation to contribute licenses under the Partnership Agreements. But this duty fit awkwardly with the FCC's allocation method for new spectrum bands. In all but a few cases,[213] the licenses the FCC granted

---

[209] Plaintiffs' Ex. 65; Dkt. No. 93 at 38, ¶ 59, n.124.
[210] RSA 18 and RSA 19 Partnership Agreements, Plaintiffs' Exs. 17-18 at 8.
[211] Dkt. No. 93 at 53, ¶ 38.
[212] *See* SCALIA & GARNER at 183, *supra* note 133.
[213] The Part-22 Cellular license as to the McAllen Partnership and the 700 MHz license as to all Partnerships. Plaintiffs' Exs. 44, 65.

to AT&T did not fit entirely within the Partnership's service area. These "overlapping licenses" would not make much sense to allocate in their entirety to the Partnership,[214] so AT&T could either partition and allocate the encompassed portion to the Partnership, or it could retain the license and "lease" the use of the spectrum within the Partnership's area to the Partnership. The former choice would trigger FCC's buildout requirements for *both* of the newly partitioned license areas, potentially creating double work for the licensee.[215] So AT&T went with the latter choice, which violates the express terms of section 4.4.

But that does not necessarily mean that AT&T breached. The Limited Partners recognized that overlapping licenses put AT&T in a pickle.[216] Plaintiff SWT (Limited Partner in RSA 18) stated in early 2014 that there may be reasons for AT&T to hold title to the spectrum licenses, but set out three conditions for the deviation from the strict terms of section 4.4: (1) that AT&T would hold the license for the Partnership's benefit, (2) that there is no early termination clause—the Partnership may use the license for its entire term plus renewals, and (3) that if the holder of the license becomes insolvent, the license will be transferred to the Partnership for nominal consideration.[217] On May 8, 2015, after the spectrum Service Agreements had been finalized and disclosed,[218] Plaintiff VTX conceded to AT&T that in "some cases" where there are "good

---

[214] The Court is unsure if that would lead to an expanded service area or just a waste of an undivided portion of the license. Neither case seems ideal, and the Limited Partners do not seem to think it a plausible option prior to litigation.
[215] Plaintiff does not appear to dispute this point throughout its pleadings, but only argues that partitioning was unnecessary for non-overlapping licenses.
[216] Defendants call this "impracticability" in their Response to Plaintiffs' Motion for Partial Summary Judgment. Dkt. No. 93 at 54, ¶ 81. That may not be a poor choice of words in the lay or business sense, but under Delaware law, impracticability applies only where "(1) an event occurs that the parties assumed would not happen; (2) continued performance is not commercially practicable; and (3) the party asserting the defense . . . did not expressly or impliedly agree to performance in spite of impracticability." *CRS Proppants Ltd. Liab. Co. v. Preferred Resin Holding Co., Ltd. Liab. Co.*, No. N15C-08-111 MMJ CCLD, 2016 Del. Super. LEXIS 520, at *17 (Super. Ct. 2016). Here, the Defendants do not argue that this doctrine applies, but rather than Plaintiff Limited Partners, recognizing the difficulty of performance under section 4.4, waived or amended its application.
[217] Plaintiffs' Ex. 33 (email from Gary Gilmer).
[218] Plaintiffs' Ex. 35 (January 9, 2015, letter from Eric Wages to VTX disclosing the Agreements in response to VTX's November 6, 2014 letter after the capital call).

reasons" not to allocate the spectrum licenses such that "the proper approach is to allocate the costs of spectrum to recoup the license fee paid for by AT&T."[219] While this statement does not settle all the terms[220] of section 4.4 (which Dave Osborn calls the "default approach"), it does grant written consent to AT&T to do something other than allocate the licenses.

How legally effective are these statements? All the Partnership Agreements contain the same waiver provision which simply states that a waiver must be, in writing, given to the party requesting it.[221] The Court finds that the aforementioned statements by VTX and SWT constitute a waiver such that Defendants' motion for summary judgment is **GRANTED** as to VTX and SWT's claims that the spectrum Service Agreements for overlapping licenses is a *per se* breach of section 4.4 of the Partnership Agreements. However, the Court clarifies that a number of claims do survive Defendants' motion for summary judgement. First, the Court cannot find evidence that Plaintiff Riviera waived section 4.4 of the RSA 19 Partnership Agreement, and the Court **DENIES** Defendants' motion for summary judgment as to that claim. Second, neither VTX nor SWT granted a waiver for non-overlapping licenses, so as to the McAllen Partnership's Part-22 licenses[222] and RSA 18's 700 MHz license,[223] failure to allocate is a breach of contract and Plaintiffs' motion for summary judgment is **GRANTED**.[224] Third, the waivers are not general, they are quite specific. These conditions on waiver of 4.4 relate to process and price, so the Court

---

[219] Defendant's Response, Ex. 11 (email from Dave Osborn).
[220] For example, the term of the recoupment is undetermined at initial issuance since the life of the license is subject to renewals granted by the FCC.
[221] Partnership Agreements, Plaintiffs' Exs. 16 at 46, 17 at 32, 18 at 32.
[222] McAllen Partnership callsigns KNKR228 and KNKR236. *See* Dkt. No. 93 at 38, ¶ 59, n.124.
[223] RSA 18 Partnership callsign WQJQ787. *See* Plaintiffs' Ex. 44 (citing Plaintiffs' Exs. 32, 65, and FCC website). AT&T also held several non-overlapping 700 MHz licenses for which it has Service Agreements with the McAllen Partnership, but the Court has already held that the General Partner was not obligated to transfer non-Part-22 licenses under the McAllen Partnership Agreement.
[224] Plaintiff's Ex. 44 does not appear to claim to be exhaustive, so the Court is not currently apprised of whether there are addition licenses for geographies contiguous with or completely within Partnership service areas. If there are, the same interpretation of section 4.4 applies. All non-overlapping licenses must be contributed to the RSA 18 and RSA 19 Partnerships, while only Part-22 non-overlapping licenses must be contributed to the McAllen Partnership.

analyzes the General Partner's actions pursuant to those waivers below along with Plaintiffs' claims for breach of fiduciary duty. The General Partner's spectrum-related decisions can be disloyal or breach the waivers provided to it whether or not those actions breach section 4.4.

The Court thus begins its familiar review of AT&T's self-dealing transactions from a starting point of the Partnerships' best interest. Under the RSA 18 and 19 Partnership Agreements, the section 7.5 safe harbor applies to modify the General Partner's duty because (1) both book value and fair value are *prima facie* arm's length and (2) these agreements involve the Partnerships paying AT&T for the rendition of services.[225] Therefore, Plaintiff must prove by a preponderance of the evidence that the General Partner acted with gross negligence or willful misconduct to prove a breach under those two Agreements.

But breach of fiduciary duty under the McAllen Partnership is still reviewed under entire fairness, and it is at this point that the scope of the Limited Partners' waiver of section 4.4 pops back into the picture. The Court does not have to depend merely on its own impressions of the parties' *ex post* arguments to know what would make the deal fair. SWT (through Gary Gilmer) and VTX (through Dave Osborn) told AT&T (through Eric Wages) what was fair. The license would need to be held for the Partnership's benefit: "the Partnership is not giving up any rights or benefits that it would have had with outright ownership."[226] VTX expressly stated that the price should be fixed to recouperation of AT&T's costs in buying the license; that is, the book value.[227] It is the Limited Partners' prerogative to define the contours of the waiver of section 4.4, a provision for their benefit. Furthermore, the Court does not find this demand for a trust-like

---

[225] *Supra* part III.B.1.b.i.
[226] Plaintiffs' Ex. 33 (email from Gary Gilmer).
[227] Defendant's Ex. 11 (email from Dave Osborn).

relationship with respect to the spectrum licenses to be out of parity with the General Partner's other duties to the Limited Partners.

But AT&T did not hold fast to the terms of the waivers. Instead, it saw retention of the licenses as giving it "total ownership of a critical operating asset."[228] Instead of charging for recoupment of costs, AT&T has admitted that "Mr. Wages explained that the Partnerships would pay spectrum charges *perpetually* for spectrum used by the Partnerships."[229] These terms are in direct conflict with the way that the Limited Partners expressed their waiver of section 4.4—as an accounting maneuver in which AT&T holds the licenses but they functionally belong to the Partnerships.

AT&T further viewed "charging for Spectrum" as an opportunity to—in the words of Eric Wages—"[save] in terms of cash outflows (i.e., distributions to minority partners)."[230] Emails to Bradley Gifford in 2014 indicate that "preliminary analysis is showing operating spectrum lease provides the most NPV value to AT&T (and also the worst to the minority partners)."[231] Just in 2015, the General Partner's accountant circulated as one of their most significant accomplishments that the spectrum Service Agreements had saved AT&T over $51 million across several "batches" of partnerships (including the McAllen Partnership).[232] It rains on these employees' parade a bit the profit was earned in conflict with section 4.4 and—even if they considered retaining licenses as permissible—section 4.2 which provides that the "General Partner shall not be entitled to any profit in rendering [incidental business] services to the Partnership."[233] For that reason, the purported advocate for the Partnerships within AT&T, Melody Deaver, maintained in deposition

---

[228] Plaintiffs' Ex. 78 at 6.
[229] Dkt. No. 63 at 6, ¶ 14 (emphasis added).
[230] Plaintiffs' Ex. No. 80.
[231] Plaintiffs' Ex. 115.
[232] *Id.*
[233] Partnership Agreements, Plaintiffs' Exs. 16 at 12, 17 at 8, 18 at 8.

testimony that her "understanding is there's no profit on the license—on the service agreement" and that her "information has primarily come from Eric Wages."[234] AT&T also chose to charge for the licenses' fair value instead of the book value to make "even more $".[235] The thought of charging the mere book value made Wages say "Ugh."[236]

These facts alone indicate a purpose other than the best interest of the Partnerships and a serious potential for willful misconduct. But it does not stop there. AT&T leveraged these service charges for control in an attempt to squeeze out VTX. In the McAllen Partnership, the spectrum Service Agreements were executed on October 2, 2014,[237] without disclosure to VTX. By backdating the fees to the first of that year,[238] however, AT&T created a service expense to the Partnership of $11.7 million[239] from which over $2 million must be paid by VTX within 60 days in cash or in dilution of partnership interest.[240] When VTX flexed its liquidity[241] and politely but "strongly question[ed] the propriety of this arrangement,"[242] AT&T backed down on the capital call.[243] But it was too late. The "September financials let the cat out of the bag"[244] that an $11.7 million expense had been incurred without AT&T providing an official explanation nor providing copies of the spectrum Service Agreements to the Partnerships.[245]

---

[234] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 79-80.
[235] Plaintiffs' Ex. 114.
[236] *Id.*
[237] *See* Plaintiffs' Ex. 47.
[238] *Id.*; Dkt. No. 63 at 4, ¶ 8.
[239] Plaintiffs' Ex. 114.
[240] *See* Plaintiffs' Ex. 34.
[241] *See id.* at 5, ¶ 9.
[242] Plaintiffs' Ex. 34.
[243] *Id.* ¶ 10
[244] Plaintiffs' Ex. 81 (words of Melody Deaver); *see also* Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 203 (explaining what she meant when she said that the September financial let the cat out of the bag).
[245] *See* Plaintiffs' Ex. 34 (demanding copies of the spectrum Service Agreements) and Plaintiffs' Ex. 35 (Eric Wages providing them).

Use of the spectrum Services Agreements as a smoke screen for an attempted squeeze out is not fair dealing.[246] In fact, Plaintiffs have met their burden to prove AT&T's willful misconduct. The very licenses that AT&T should have allocated to the Partnerships under the default application of their contract were retained and used to generate a surprise capital call to pry control of the Partnerships out of Plaintiffs' hands. Therefore, the Court need not even consider whether AT&T's decision to charge its fees based on fair value instead of book value met the fair price prong,[247] other than to say that it is not within the terms of the waiver provided by VTX.[248]

Therefore, the Court **GRANTS** Plaintiffs' motion for summary judgment and finds that, as to the McAllen Partnership Agreement, the General Partner's treatment of spectrum licenses **BREACHED ITS FIDUCIARY DUTY**, and as to the RSA 18 and RSA 19 Partnership Agreements, the General Partner **BREACHED SECTION 7.5** by willfully using undisclosed charges booked under the spectrum Service Agreements to divert distributions and attempt a squeeze out in 2014. The Court finds clear and convincing evidence of the General Partner's willful misconduct such that exculpation is unavailable under either the McAllen Partnership or RSA 18 and 19.

d.    Other revenue streams

Plaintiffs did not move for summary judgment as to breach for "other revenue streams" and "improper revenue allocations," but do ask the Court to make a finding of burden shifting.[249] The Court simply reiterates its previous holding that insofar as these claims are for diversion of

---

[246] *See In re Cellular Tel. P'ship Litig.*, 2021 Del. Ch. LEXIS 224, *1-85 (Ch. 2021).
[247] Though Mr. Wages' frustration about paying book value does not bode well for Defendants' argument that fair value was in the Partnerships' best interest. Plaintiffs' Ex. 114.
[248] Defendant's Ex. 11 email from Dave Osborn (referring to the price that AT&T paid the FCC, i.e., book value).
[249] Dkt. No. 84 at 80, ¶ 128.

Partnership opportunities, section 7.5 of the RSA 18 and 19 Partnership Agreements does not apply and the burden is on Defendants to prove entire fairness subject to the availability of exculpation.

### C.  Claims against Non-Partner Defendants

Defendants seek summary judgment against Plaintiffs claims against non-partner Defendants, AT&T Inc., AT&T Mobility Corporation, and Cricket. Whether there is a genuine dispute as to any material fact on these topics is analyzed below.

#### 1.  Breach of the duty of loyalty

It is well established law in Delaware that affiliates "who ultimately control a corporate general partner owe fiduciary duties to the limited partnership."[250] That is, they owe a "duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership."[251] The word "property" is key. "[T]o have any fiduciary duties to an entity, the affiliate must exert control over the assets of that entity."[252]

##### a.      AT&T Inc.

Defendants argue that the distinctions of the corporate form shield the parent/holding company, AT&T Inc., from liability. [253] They also state that the "record is devoid of evidence that AT&T Inc. exercised control over the Challenged Actions."[254]

But AT&T's own advocate for the Partnerships within its own ranks, Melody Deaver, could see no indication of separateness between AT&T entities; to her, "it's all AT&T."[255] More

---

[250] *Fannin v. UMTH Land Dev., L.P.*, No. 12541-VCF, 2020 Del. Ch. LEXIS 253, at *25 (Ch. 2020) (citing *In re USACafes, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991)).
[251] *USACafes*, 600 A.2d at 49.
[252] *Bay Ctr. Apartments*, 2009 Del. Ch. LEXIS 54, 2009 WL 1124451, at *9 (citing *Wallace v. Wood*, 752 A.2d 1175, 1178 (Del. Ch. 1999)).
[253] Dkt. No. 80 at 47, ¶ 67.
[254] *Id.*
[255] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 11.

importantly, Plaintiffs have provided evidence that AT&T Inc. *did* exercise control over Partnership property so as to make it a fiduciary under *USACafes*.

AT&T Inc.'s ability to define the scope of Partnership assets gave rise, in part, to this suit. Plaintiffs challenge Defendants on the 2014 decision not to allocate newly-acquired Cricket customers homed in the Partnership areas to the Partnerships, and Defendants admit that "AT&T Inc. pursued the Cricket transaction for its benefit."[256] Plaintiffs challenge charging the Partnerships for use of spectrum licenses, and Defendants admit that "AT&T Inc. [sought] compensation for the additional spectrum acquired and used for the benefit of the Partnerships."[257] The record speaks loud and clear that the AT&T Partnership Accounting Group (whatever the entity on its employee's paychecks[258]) served the financial interests of AT&T Inc. as opposed to the Partnerships.[259] And its employees, including Eric Wages, Bradley Gifford, and Melody Deaver, were the ones who made the challenged 2014 capital call.[260] The Court finds that this attempted squeeze out, if not several other of the challenged actions, fit within AT&T Inc.'s broader project to eliminate distributions to minority partners.[261]

Defendants assert that "there is no evidence that AT&T Inc. was involved in the determination of the Cricket rate for partnership markets,"[262] but Plaintiffs provide evidence that the representation letters associated with the audits of the General Partner by Ernst & Young were set for signature by AT&T Inc. officers.[263] While a name on a page would not, by itself, be much

---

[256] Dkt. No. 63 at 11, ¶ 47.

[257] *Id.* at 4, ¶ 7.

[258] According to Defendants, "[i]ndividuals who act on behalf of AT&T entities like AT&T Mobility Corporation and New Cingular Wireless PCS, LLC are employed by various affiliated payroll entities, such as AT&T Services, Inc. and AT&T Mobility Services LLC." Defendants' Motion for Summary Judgment, Ex. 42; Plaintiffs' Ex. 1, deposition of the General Partner's corporate representative, at 51.

[259] *E.g.,* Plaintiffs' Ex. 108.

[260] Plaintiffs' Ex. 82.

[261] *See* Plaintiffs' Ex. 132 at 37-38 (describing the involvement of John Stephens in Project LESS).

[262] Dkt. No. 108 at 48, ¶ 73.

[263] Plaintiffs' Ex. 120-121.

evidence of control over property, the Court notes the importance of these audits as a check on the General Partner's ability to unilaterally set rates that tunnel value from the Partnerships to AT&T Inc., the issue here. In fact, AT&T Inc.'s detachment is unlikely given that in EY's internal memos at the relevant time, it stated that "AT&T's legal counsel has concluded that a data network cost sharing process is acceptable under the applicable partnership agreements."[264]

The record indicates that AT&T Inc. did exercise control over Partnership assets such that they owe the Limited Partners a duty of loyalty in exercising that control under Delaware law. Therefore, Defendants' motion for summary judgment on this point is **DENIED**.

b.     AT&T Mobility Corp.

AT&T Mobility Corp. is the manager of the General Partner, also known as New Cingular *doing business as* AT&T Mobility Corp. But what does the record say about AT&T Mobility's control over Partnership property?

The Court has already discussed that an FCC filing by AT&T Teleholding, Inc. states that "AT&T Mobility Corporation manages and controls . . . New Cingular Wireless PCS, LLC".[265] The General Partner had no employees and "it is the officers of AT&T Mobility Corporation that act of behalf of Cingular Wireless PCS, LLC."[266] Therefore, the challenged actions by the General Partner (discussed in the bulk of this opinion) double as claims against AT&T Mobility Corp.

Still Plaintiffs show a few other specific instances of control in which the Mobility name is used in relation to the challenged transactions. Like AT&T Inc., AT&T Mobility Corp. was set for signature on EY's representation letters.[267] AT&T Mobility Corp. is the manager of both the

---

[264] Plaintiffs' Ex. 96 at 6.
[265] Dkt. No. 56 at 93 n.320 (quoting https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp?applType=search&fileKey=386008086&attachmentKey=20527746&attachmentInd=applAttach).
[266] Defendants' Motion for Summary Judgment, Ex. 42.
[267] Plaintiffs' Ex. 120-121.

General Partner and of Cricket.[268] "Defendants admit that AT&T Mobility declared a capital call due within 60 days."[269] In deposition testimony, John Stephens, AT&T Inc.'s CFO, describes Eric Wages as a Mobility employee who was "actively involved with Project LESS slash Project Smoothie."[270] Wages was also involved in the spectrum decision.[271]

Defendants argue that "because AT&T Mobility Corporation is not even in the same corporate reporting structure as General partner New Cingular, the two entities' financials are not bound together in any way."[272] But to support that proposition, they cite to their written responses to Plaintiffs' notice of deposition,[273] wherein the Court can find no evidence to support the proposition in the motion. On the contrary, it makes admissions about AT&T Mobility Corp.'s control over the General Partner and states that "New Cingular Wireless PCS, LLC . . . is wholly owned by AT&T Mobility II LLC [which is] owned by AT&T Mobility LLC, BellSouth Mobile Data, Inc., and AT&T Corp."[274] And even if there is some unexplained separation between the entities within AT&T's accounting regime, this document provides considerable evidence of AT&T Mobility Corp.'s control over the General Partners, and thereby Partnership assets.

Thus, AT&T Mobility Corp. owes a duty of loyalty to the Plaintiffs and Defendant's motion for summary judgment on this point is **DENIED**.

        c.    <u>Cricket</u>

The Court has already found that when Cricket was acquired by AT&T, it was set up to improperly compete against the Partnerships and the compensation paid for Cricket customers'

---

[268] Plaintiffs' Ex. 64.
[269] Dkt. No. 63 at 4, ¶ 8.
[270] Plaintiffs' Ex. 132 at 97
[271] Dkt. No. 63 at 6, ¶ 14.
[272] Dkt. No. 80 at 42, ¶ 70.
[273] Defendants' Motion for Summary Judgment, Ex. 42.
[274] *Id.*

use of Partnership networks was improperly low. But did Cricket as a corporate entity owe the Partnerships loyalty?

Plaintiffs provide evidence that Cricket's Director of Finance, Brian Muncy, lobbied for volume discounts on reseller rates[275] and that AT&T was amiable to this effort[276] (even if it was not ultimately adopted). But Plaintiffs fail to mention that Mr. Muncy's email stated that "[t]here's probably nothing we can do about the partnership rates (Brad [Gifford of AT&T Partnership Accounting Group] would have to weigh in on that)."[277]

Plaintiffs also show that Cricket was included in AT&T staff meetings that the Limited Partners were not[278] and that AT&T sometimes mines Cricket for employees to promote to key positions within AT&T.[279] This evidence, viewed cumulatively, indicates that Cricket was interior to AT&T's strategic plan to tunnel value out of the Partnerships.

However, having a seat at the table is not the standard under *USACafes*. The Court can find no evidence that Cricket exercised control over Partnership property. The caselaw is clear that "*USACafes* does not apply to all affiliates in all circumstances."[280] In this Court's view, the best interpretation of Delaware law on the subject is that an affiliate's mere ability to nudge a general partner into a self-dealing transaction at a minority partner's detriment does not make that affiliate the minority partner's fiduciary. Therefore, the Court **GRANTS** Defendants' motion for summary

---

[275] Plaintiffs' Ex. 102 (emails between Brian Muncy (Director of Finance for Cricket) and Teresa Blizzard (apparently part of Partnership Accounting), including Bradley Gifford (Director of Accounting at AT&T with oversight of Partnership Accounting Group)).

[276] Plaintiffs' Ex. 103 (Philip Teske seeking a comparison of discount scenarios for Cricket).

[277] Plaintiffs' Ex. 102.

[278] Deposition of Melody Deaver, Plaintiffs' Ex. 135 at 46-50.

[279] *Id.* at 51 (Ms. Deaver says that VP/GM Anthony Galvashey "changed position" when "[h]e was working for Cricket, how he's working for AT&T."); *see also* Plaintiffs' Ex. 39 (Ms. Deaver was replaced by a former Cricket employee when she retired).

[280] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658-VCS, 2009 Del. Ch. LEXIS 54, at *33 (Ch. 2009).

judgment on this point, and fiduciary claims against Cricket entities (Cricket Communications, LLC and Cricket Wireless, LLC) are **DISMISSED**.

### 2. Conversion

Under Delaware law, the elements of conversion are "(1) [plaintiff] had a property interest in equipment or other property; (2) he had a right to possession of the property, and (3) the property was converted, in that the defendants wrongfully possess or dispose of the property as if it was their own."[281] Defendants argue that if the Non-Partner Defendants did not own any duty of loyalty to provide property, then Plaintiffs have no rights in the property.[282] This statement confuses the issue. It is true that for a plaintiff to succeed on a conversion claim against a defendant, her rights to the property must be independent of a duty imposed by a contract between the two parties.[283] That rule serves to prevent a plaintiff from bootstrapping breach of contract claims into conversion claims over the exact same conduct.[284] Bootstrapping is not an issue here since the Plaintiffs had no contract with the Non-Partner Defendants. It is no defense to a conversion claim that Plaintiffs' property interest arises out of a contract with a third party.[285]

A defendant need not be a fiduciary to be a converter. There is an independent duty not to convert property,[286] and Plaintiffs have raised a genuine dispute about conversion as to each Non-Partner Defendant. For example, the Court has already held that the retention of Cricket customers

---

[281] *Malca v. Rappi, Inc.*

[282] Dkt. No. 80 at 51, ¶ 74.

[283] *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009).

[284] *See id.; see also Data Mgmt. Internationale, Inc. v. Saraga,* No. 05C-05-108, 2007 Del. Super. LEXIS 412, at *9 (Super. Ct. 2007).

[285] To use a classic tort example, one who takes another's horse without permission in the dead of night could not defend himself on the ground that the true owner's property interest and possession rights were conferred by a contract for sale from a third-party horse breeder.

[286] Dkt. No. 60 at 30 (citing *Data Mgmt. Internationale, Inc. v. Saraga,* No. CIV.A.05C-05-108, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007); here, the Court discusses conversion of customer accounts, licenses, and network usage since "[u]nder Delaware law, an action in conversion will not lie to enforce a claim for the payment of money." *AM Gen. Holdings, LLC v. Renco Grp., Inc.*, No. 7639-VCN, 2013 Del. Ch. LEXIS 266, at *56-57 (Ch. 2013) (internal quotations omitted).

homed in the Partnership service areas was improper.[287] Under fiduciary or contractual duties owed by the General Partner, the Limited Partners had property interests and possessory rights to those customer accounts. But Cricket wrongfully[288] possessed those accounts and booked them as its own assets.[289] Similarly, AT&T Inc. wrongfully possessed, through its subsidiaries,[290] spectrum licenses that the Partnerships had property interests in and possessory rights over.[291] More abstractly (but still tortiously), all Non-Partner Defendants have treated the Partnerships' networks—over which the Partnerships certainly had property interest and possessory rights—as their own by compensating only costs for their non-homed subscribers' data roaming. Therefore, Defendants' motion for summary judgment as to Plaintiffs' conversion claims is **DENIED**.

### 3. Tortious interference

There are five elements to a tortious interference claim under Delaware law: "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such a contract, (4) without justification, (5) which causes injury."[292]

But affiliates regularly confer with each other regarding their contractual obligations, and Delaware law bestows a privilege on good faith recommendations that a contract be terminated. Thus, "where Corporations affiliated through joint ownership confer with respect to a contract to which one of them is party and a breach of that contract follows, there can be no non-contractual liability to the affiliated Corporation, which is privileged to consult and counsel with its affiliates,

---

[287] *Supra* part III.B.2.b.

[288] *See Segovia v. Equities First Holdings, LLC*, No. 06C-09-149-JRS, 2008 Del. Super. LEXIS 197, at *66 (Super. Ct. 2008) ("Conversion need not be accompanied by a subjectively wrongful intent to be actionable. A person who mistakenly believes that his or her conduct is legal may nonetheless commit conversion.") (internal citations omitted).

[289] Dkt. No. 63 at 5-6, ¶ 11.

[290] AT&T Mobility Spectrum LLC held the licenses that the Court has determined were *per se* breaches of section 4.4 of the relevant contracts with the General Partner.

[291] Plaintiffs' Exs. 74-75.

[292] *Bhole, Inc. v. Shore Invs.*, 67 A.3d 444, 453 (Del. 2013).

unless the plaintiff pleads and proves that the affiliate sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure plaintiff."[293]

Here, the General Partner and Non-Partner Defendants are affiliated through joint ownership—they are all owned by AT&T Inc.[294]—so they are privileged to make good faith recommendations to the General Partner about termination, modification, or breach of the Partnership Agreements.

"For participants in a competitive capitalist economy, some types of intentional interference with contractual relations are a legitimate part of doing business."[295] For example, in the case of an efficient breach, a parent or affiliate is permitted to recommend paying expectation or liquidated damages instead of going through with performance under the contract.[296] "Determining when intentional interference becomes improper requires a complex normative judgment relating to justification based on the facts of the case and an evaluation of many factors."[297] Those factors, adopted by the Delaware Supreme Court from the Restatement (Second) of Torts, are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.[298]

Delaware courts have found "bad faith where the parent corporation took action that both induced a breach of contract and rendered the subsidiary unable to satisfy its contractual obligations."[299]

---

[293] *Shearin v. E.F. Hutton Grp.*, 652 A.2d 578, 591 (Del. Ch. 1994).

[294] Dkt. No. 2; AT&T Inc.'s Form 10-K for fiscal year ended December 31, 2021, Exhibit 21 (accessed via EDGAR).

[295] *NAMA Holdings, LLC v. Related WMC LLC*, No. 7934-VCL, 2014 Del. Ch. LEXIS 232, at *81 (Ch. 2014).

[296] *See Bhole*, 67 A.3d at 453.

[297] *NAMA Holdings*, 2014 Del. Ch. LEXIS 232, at *81 (quoting *Shearin*, 652 A.2d at 589) (cleaned up).

[298] *WaveDivision Holdings, LLC v. Highland Capital Mgmt., Ltd. P'ship*, 49 A.3d 1168, 1174 (Del. 2012).

[299] *NAMA Holdings*, 2014 Del. Ch. LEXIS 232, at *95-96 (collecting cases).

At least one court has opined that diverting resources from one subsidiary to another could constitute maliciousness.[300]

After considering these elements, factors, and judicial practices, the Court finds that AT&T Inc. and AT&T Mobility Corp. can be held liable on a theory of tortious interference, but Cricket cannot. The General Partner's parent and manager were very aware of the Partnership Agreements, and AT&T counsel[301] reviewed them to make the (in hindsight, wrong) determination that they allowed implementation of the data cost sharing methodology.[302]

The Court has found that the actions challenged in this lawsuit were at least in part a result of top-down policies to tunnel value from the partnerships and ultimately eliminate the need for distributions, if possible. These Project LESS/Smoothie policies started as early at 2000 and came from the very top: John Stephens and Debbie Dial.[303] They were implemented directly down the chain of command to Eric Wages and the Partnership Accounting Group.[304] They were ongoing in 2021 and possibly continue now.[305] The point was to gain control for AT&T and eliminate distributions to limited partners, whether it be through handshake deals with willing sellers or through something more athletic like a squeeze out.[306] Limited partners' willingness to sell their interest was not necessarily a sticking point; for the Plaintiff Partnerships priority level, AT&T's strategy focused "on the problem partnerships first followed by those that have expressed a

---

[300] *Himawan v. Cephalon, Inc.*, No. 2018-0075-SG, 2018 Del. Ch. LEXIS 585, at *29 (Ch. 2018) (dismissing where "there is no allegation in the Complaint that Allergan and Cephalon are competitors, such that it may be reasonable to infer that Teva Ltd. may prefer one to the detriment of the other. Nor do the Plaintiffs posit in their Complaint that Teva Ltd. has insufficient resources, such that it may be reasonable to infer that Teva Ltd.'s acquisition and plan for Allergan would necessarily involve removing resources from Teva Ltd.'s other subsidiaries.").
[301] AT&T's general counsel was shared between subsidiaries and affiliates. Plaintiffs' Ex. 132, deposition of John Stephens, at 50.
[302] Plaintiffs' Ex. 96 at 6.
[303] Deposition of John Stephens, Plaintiffs' Ex. 132 at 35-41, 89.
[304] *Id.* at 97-98.
[305] *Id.* at 46.
[306] Plaintiffs' Ex. 68 at 11 (discussing squeeze outs of the partners one priority level higher than the Plaintiffs here, although ultimately a squeeze out was attempted on the McAllen Partnership).

willingness to sell."[307] In contrast with cases of efficient breach, the underlying breaches of contract and breaches of fiduciary duty by the General Partner were obscured in order to fly under the Limited Partners' radars.[308] The actions of Partnership Accounting Group and Eric Wages directly caused the Partnerships to have money diverted from their coffers into those of wholly owned AT&T subsidiaries.

There is no evidence, on the other hand, that Cricket had access to the Partnership Agreements or any reason to know their content. There is also a dearth of evidence that Cricket's efforts to obtain a lower reseller rate was anything other than an attempt to strengthen its own bottom line. While AT&T Inc. and AT&T Mobility Corp. had a more nefarious interest in diverting prepaid customers and data network revenue from the Partnerships to Cricket (as it is wholly owned by AT&T), Cricket's interests in getting the best deals for itself are, in this Court's view, "legitimate profit seeking."[309]

Therefore, Defendants' motion for summary judgment is **GRANTED** as to Plaintiffs' tortious interference claims against Cricket but **DENIED** as to the claims against AT&T Inc. and AT&T Mobility.

## IV. CONCLUSION AND HOLDING

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' and Plaintiffs' motions to for summary judgment. The Court has interpreted the three Partnership Agreements under Delaware law to impose standards that are not exactly like the ones

---

[307] *Id.* at 12.
[308] For example, failure to adequately disclose the data cost sharing methodology before or immediately after the Cricket acquisition and failure to provide copies of the spectrum Service Agreements when executed or in advance of the capital call.
[309] *See Shearin v. E.F. Hutton Grp.*, 652 A.2d 578, 591 (Del. Ch. 1994).

moved for by either party. Under the correct legal standards, the Court made the following determinations.

The Court **GRANTS** Plaintiffs' motion and hereby finds liability for:

- Implementation of the data cost sharing methodology;
- Retention of Cricket customers and methodology adopted to compensate the Partnerships;
- Records violations in adopting the Cricket arrangement;
- Failure to allocate non-overlapping spectrum licenses to the Partnerships; and
- Backdating spectrum charges to attempt a squeeze out.

The Court **GRANTS** Defendants' motion and hereby dismisses claims for:

- Failure to allocate non-Part 22 licenses to the McAllen Partnership;
- Failure to allocate new spectrum licenses as a *per se* breach of contract as to VTX and SWT;
- Breach of the duty of loyalty as to Cricket; and
- Tortious interference with a contract as to Cricket.

The Court **DENIES** Defendants' motion where they move to dismiss claims for:

- Time bar defenses;
- Failure to allocate new spectrum licenses as a *per se* breach of contract as to Riviera;
- Breach of the duty of loyalty as to AT&T Inc. and AT&T Mobility Corp.;
- All conversion claims; and
- Tortious interference with a contract as to AT&T Inc. and AT&T Mobility Corp.

Naturally, this summary of the Court's detailed holdings should be considered just that: a summary. The analyses above contain important details that are omitted in this section. The Court also notes that in its previous order,[310] it stated that the parties' dispute over attorney's fees would be decided later.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 21st day of February 2023.

_____
Micaela Alvarez
United States District Judge

---

[310] Dkt. No. 111 at 2.